# EXHIBIT 2

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION


   KELLY RODGERS,

            Plaintiff,
                                        CASE NO. 2:23-cv-13110
   vs.
                                        JUDGE GERSHWIN A. DRAIN
   FENTON AREA PUBLIC SCHOOLS,
   GEARUP2LEAD, a Domestic Nonprofit
   Corporation, ADAM HARTLEY,
   individually and in his official
   capacity as Superintendent, and
   WINSTON STOODY, individually and
   in his official capacity as
   Executive Director,

            Defendants.
   _____/


              DEPOSITION OF ADAM J. HARTLEY VIA ZOOM


       Taken by the Plaintiff on the 13th day of January, 2025,

       via Zoom Video Conferencing, commencing at or about

       10:00 a.m.


   APPEARANCES:


   For the Plaintiff:        MR. TOM R. PABST    (P27872)
                             MR. JARRETT M. PABST  (73698)
                             Tom R. Pabst P.C.
                             2503 South Linden Road
                             Flint, Michigan  48532-5462
                             (810) 732-6792
                             tom@tomrpabstpc.com
```

```
 1  APPEARANCES (Continued):

 2

 3  For the Defendants:       MS. LINDSAY P. HAZEN  (P85861)
    (GEARUP, Hartley and      Giarmarco, Mullins & Horton, P.C.
 4  Stoody)                   101 West Big Beaver Road
                              Floor 10
 5                            Troy, Michigan  48084-5253
                              (248) 457-7047
 6

 7  For the Defendants:       MS. KAILEN C. PIPER  (P82865)
    (Fenton Schools and       O'Neill, Wallace and Doyle, P.C.
 8  Hartley)                  300 St. Andrews Road
                              Suite 302
 9                            Saginaw, Michigan  48638-5977
                              (989) 790-0960
10                            kpiper@owdpc.com

11

12  ALSO PRESENT:             KELLY RODGERS

13

14  REPORTED BY:              Mr. David S. Ripka, CSR 2175
                              Certified Shorthand Reporter
15                            daveripka9@comcast.net
                              (800) 542-4531
16
```

Page 3

INDEX OF WITNESS

WITNESS                                PAGE

ADAM J. HARTLEY
  Examination by Mr. Tom Pabst          4
  Examination by Ms. Hazen             65

INDEX OF EXHIBITS

EXHIBIT      DESCRIPTION       MARKED

         (NO EXHIBITS MARKED)

Page 4

Via Zoom
Monday, January 13, 2025
10:00 a.m.

P R O C E E D I N G S

ADAM J. HARTLEY,
having been duly sworn by the Court Reporter, was
examined, and testified on his oath as follows:

EXAMINATION

BY MR. TOM PABST:

Q   Good morning, Mr. Hartley.  I'm Tom Pabst.  And this is
    Jarrett Pabst, my son and co-counsel.  We represent Kelly
    Rodgers, who's sitting here at the table with us, okay?
        And you are Adam Hartley, correct?
A   That's correct.
Q   Okay.  You know, I'm going to read you -- Were you aware
    that I took Winston Stoody's deposition just like I'm
    taking your deposition here today?
A   Yes, I'm aware.
Q   Okay.  Did you ever read his transcript of his
    deposition, what he said?
A   I read what Lindsay sent to me.  I don't know if
    that's -- I don't know if that's a summary or a
    transcript.
Q   Okay.  Well, I'm going to read you an excerpt of it,
    okay?  And please listen carefully.  And then I just want

Page 5

    to ask you a few questions about it, okay?
        Page 34, line 16, I asked him a question, "You
    know," there's a parent that said "that there was a
    requirement that the family of the kids waive, you know,
    their right to special ed, you know, to be admitted
    into --"
        And he blurted out, and he says -- answered,
    "That's not true.  That's not true."
        "Question:  That's not true?"
        "Answer:  (No audible response.  Moving head in
    a negative manner)."
        He's shaking, no, that's not true.
        "Question:  That be would wrong to do that,
    right"
        "Answer:  Yes."
        And question by me:  "Why would it be wrong?"
        "Answer:  You can't require somebody to
    waive -- You're talking about IEP?"
        And I said, "Yeah."
        And he said, "Yeah.  No," you can't.
        "Question:  The kids need it, right?"
        And it says, "Answer:  Yeah, it can't be done.
    You can't require somebody to drop an IEP.  It doesn't
    happen."
        Do you agree with that testimony?

Page 6

        MS. PIPER:  I'm going to object to form and
    foundation.
        MS. HAZEN:  I'll join.
        MS. PIPER:  Adam, you can answer Mr. Pabst's
    question.
Q   (BY MR. TOM PABST)  Yeah.  They can make objections,
    okay, to preserve them on the record.  No problem with
    that.  But then you have to sort of concentrate Mr.
    Hartley and then answer the question.
A   Okay.  So, if you could, just -- What's the ques --
    what's the specific question about what you just read,
    sir?
Q   Well, he said it can't be done.  You can't have a parent
    waive an IEP for the kid.  "You can't require somebody to
    drop an IEP.  It doesn't happen."  That's his testimony.
        I just wonder if you agree or disagree with his
    testimony.
A   School districts -- If a student has an IEP, then school
    districts have to honor that IEP.  There are situations
    across the state of Michigan and across the country where
    if a parent wanted a certain student to go to a
    particular program that did not provide the supports
    listed within the IEP, the parent has every right to ask
    if that's a possibility to remove that and to sign them
    out of special ed, so to speak.  It is not up to the

Page 7

1  school district to -- to say that they should do that or
2  warrant that.
3         So to answer your question, that is not
4  something that Fenton Area Public Schools would do.  But
5  from a general educational, you know, perspective across
6  the state of Michigan, there are parents that will sign
7  their students out of special ed, whether that's at
8  public schools or parochial schools, because they don't
9  have the certain supports that students need, whether
10 it's, let's say, cognitively impaired or emotionally
11 impaired.
12 Q   Okay.  So, do you know if GearUp2Lead asked parents to
13 waive their child's IEP in order to be enrolled in
14 GearUp2Lead?
15 A   No.
16        MS. PIPER:  I'm going to object to form,
17 foundation.
18        MS. HAZEN:  Join.
19 Q   (BY MR. TOM PABST)  Okay.  And no, you don't know if that
20 happened?
21 A   To my knowledge, that did not happen.
22 Q   It didn't happen?
23 A   Correct.
24 Q   Okay.  How did you get along with Winston Stoody, just
25 generally?

Page 8

1  A   Fine.
2  Q   Okay.  Did there ever come a time when you requested the
3  board to terminate Mr. Stoody's employment?
4  A   No, I did not request the board to terminate Mr. Stoody's
5  employment.
6  Q   What request did you make of the board regarding
7  Mr. Stoody?
8         MS. PIPER:  I'm going to object to the form of
9  the question.
10        Go ahead.
11        MS. HAZEN:  I'll join.
12        Go ahead.
13 Q   (BY MR. TOM PABST)  Well, you did ask the board to take
14 some action regarding Mr. Stoody, didn't you?
15 A   No.  I told the board that I would be happy to take over
16 the organization again at no salary.
17 Q   Okay.  Well, what did that have to do with Mr. Stoody?
18 A   That's when I decided that I was not going to be a part
19 of GearUp.  It was the last meeting I had with Mr. Stoody
20 and the board.  And just due to various personal and
21 professional reasons, I was retiring.  And Mr. Stoody and
22 I had different philosophies on where the organization,
23 you know, should focus.
24        And so I -- and I did say I'd be happy to take
25 over the organization.  And the board and Mr. Stoody,

Page 9

1  being the executive director, I was an employee at the
2  time of GearUp, and they chose to go to the direction to
3  sustain and maintain where Winston Stoody was taking the
4  organization.
5         And I said, "Okay.  Sounds good."  And so
6  that --
7  Q   When -- I'm sorry.  When was that; do you recall?  Do you
8  recall the date?
9  A   That would have been -- I don't know the specific date.
10 It would have been spring of 2023, I believe.
11 Q   Okay.
12 A   Late spring of 2023 --
13 Q   Okay.  Thank you.
14 A   -- I believe.
15 Q   Can you just in a couple sentences explain to us what the
16 difference in philosophies was between you and Mr. Stoody
17 as you've just testified to.
18        MS. PIPER:  Object to form and foundation.
19        And go ahead.  Answer.
20        MS. HAZEN:  I'll join.
21 Q   (BY MR. TOM PABST)  So go ahead and answer, Mr. Hartley.
22 A   Yeah, sure.  I think the crux of it was that Winston was
23 really honing in on a very isolated, you know, kind of
24 one area of Genesee County.
25        And my vision was to take the organization and

Page 10

1  work with various organizations such as the Flint
2  Whaley's Children's Center and work with very transient
3  students that I worked with in Lansing --
4  Q   Yeah.
5  A   -- and to expand the organization statewide.
6         And, um, and -- and Winston didn't share that
7  same vision.  And so I stepped away.  And Winston
8  continues to be the executive director of GearUp.
9  Q   Okay.  What were the dates you were the superintendent
10 for Fenton Schools?  When did you begin your
11 superintendency and when did you end it?
12 A   I started my role as superintendent July 1st of 2016.
13 And I resigned to take another position, it would have
14 been June of 2022.
15 Q   Okay.  When you say you resigned to take a different
16 position, what was that position?
17 A   The executive director of alternative education for the
18 Lansing Public School District.
19 Q   Okay.  Was that a school that you were running?
20 A   I started a school in Lansing, yes.
21 Q   What's the name of it?
22 A   The Lansing Learning Hub.
23 Q   How did it compare to GearUp2Lead?  I mean, is it the
24 same type of entity or was it different?
25 A   The concept was the same in a sense that the students

Page 11

1  were virtual students.  So, the students under 503(d) in
2  the state of Michigan, students can be educated via
3  online through asynchronist learning.
4  Q   Okay.
5  A   So the students have online courses that include videos,
6  tutorials.  So they learn a concept online --
7  Q   Right.
8  A   -- and they do their work.  So they can work at any time
9  during the day, at night, on the weekends.
10         And the Hub, the concept is the students come
11 in.  We build positive relationships with those students.
12 We get them reconnected with their community to see
13 themselves as leaders.  And so they have -- most students
14 that would come in were either suspended or failed, maybe
15 because of the pandemic had not been to school for
16 multiple years.
17 Q   Yeah.
18 A   And so we provided a safe positive learning space for
19 them.  But their work was done on a laptop online.
20         And so, Lansing did not have a viable
21 alternative ed program.  I went there and started the
22 Lansing Learning Hub --
23 Q   Okay.
24 A   -- which is now continuing to grow.
25 Q   How would you say that that what you just described is

Page 12

1  different than GearUp2Lead?  How is it different from
2  GearUp2Lead?
3  A   Well, the -- well, the theory isn't different.
4  GearUp2Lead was created to teach growth mindset, empathy,
5  action, responsibility, to connect with students in
6  Genesee County that, for a variety of reasons, were not
7  attending school, were not successful, and to give them
8  their basic needs.  You know, Maslow's Hierarchy of
9  Needs:  They need to feel safe.  They need to be loved
10 and feel like they belong.  They need to have high
11 self-esteem and then ultimately be resilient and take on
12 adversity.
13         And so that GearUp was created to provide that
14 to those students, the youth within Genesee County.
15 Because without those factors, they're not going to learn
16 algebra.  They're not going to be successful.
17         So the same concept:  created a school in
18 Lansing where our first priority was getting these kids
19 off the streets, building relationships, giving them a
20 safe place, taking them out into the community, finding
21 them jobs.
22         And, in essence, then they log into their
23 computers, whether it's during the day with us or at
24 night.  We had a lot of teen parents.  We had students
25 that were the breadwinner of their families taking -- at

Page 13

1  16 years old taking care of their siblings.  And so it's
2  the same concept of what -- why GearUp was created, to
3  teach that growth mindset and that leadership.
4  Q   Okay.  As part of Mr. Stoody's deposition, I marked as
5  Exhibit 1 to his deposition, a 2018-2019 contract, which
6  dealt with like a sliding scale of how much money
7  GearUp2Lead would get.
8          And on that Exhibit 1, Mr. Stoody said that he
9  wrote these words.  "Created by Adam Hartley, Fenton Area
10 Public Schools Superintendent, September 1st, 2018."
11         Do you recall creating that sliding scale
12 contract that was used between Fenton Schools and
13 GearUp2Lead?
14         MS. PIPER:  I'm going to object to the form and
15 foundation of the question.
16         But you can go ahead and answer if you
17 remember.
18         MS. HAZEN:  And I'll join.  Thank you.
19         THE WITNESS:  Yes.  The Board of Education was
20 very positive and excited to start an alternative ed
21 program.  And as superintendent of schools, with the
22 board's approval, it was my job to negotiate a contract
23 of what that would look like as revenue comes in and as
24 we contracted with GearUp just as we would -- we've
25 contracted with a multiple list of community partners for

Page 14

1  a variety of reasons.  And I do recall that sliding
2  scale, yes.
3  Q   (BY MR. TOM PABST)  Okay.  Could you just in a couple
4  sentences explain how that sliding scale worked.  It
5  looked like there was $7,000 per student that money was
6  received from the state, and could you just explain how
7  that worked.
8  A   Sure.  So that sliding scale was based on templates that
9  were out there.  Virtual schools, alt ed schools is not
10 new.  So we did a lot of research.
11         Oxford Academy is one that's been around for a
12 very long time.  And that was based on the cost of
13 educating a student.  So you take the cost of the laptop,
14 the curriculum, what it is to pay the certified teacher
15 on the back end, which was paid per pupil, per class, per
16 semester, which again is the norm in the virtual world.
17         And then that sliding scale is based on the
18 revenue that was left over.  A portion of it would go
19 back to Fenton Area Public Schools, and a portion of it
20 would go to GearUp2Lead for providing that oversight
21 of the alternative ed piece of it, what I call The Hub.
22 Q   Right.
23 A   Where the students are coming in, and as I explained in
24 the last answer, getting those basic needs met, being
25 taught growth mindset and so on.

Page 15

1 Q Okay. Do you recall the approximate amount of how much
2 the state paid per pupil to be in this program?
3 A Well, if $7,000 is on that, that would have been the per
4 pupil that year.
5 Q Okay. Okay.
6 A So, in the state of Michigan, a virtual student gets a
7 full FTE, full-time enrollment --
8 Q Okay.
9 A -- just as a face-to-face student.
10 Q Okay.
11 A So each year, that per pupil either goes up or down or
12 stays the same in the state of Michigan. So if $7,000 is
13 listed, that would have been the per pupil for that given
14 year.
15 Q Okay. And what percentage of that would have gone to
16 GearUp2Lead and what percentage would have gone to Fenton
17 Schools?
18 A So, again, the cost of educating a student, I -- I -- you
19 know, I -- I can't tell you that, that exact number at
20 that time. But let's just for all purposes say it was
21 $3,000.
22 Q Right.
23 A So that would leave $4,000 for that pupil. A percentage
24 of that then would go to Fenton Area Public Schools, and
25 then a percentage would go to GearUp for that particular

Page 16

1 student.
2 Q Okay. Thank you for that.
3       Let's say that GearUp2Lead had started getting
4 quite a few students enrolled, like 20 or 30. Would the
5 sliding scale of payment to GearUp2Lead change? I mean,
6 the split. The split.
7 A Well, if you had that -- if you have that scale in front
8 of you, it spells that out, I believe --
9 Q Okay.
10 A -- from what I recall.
11 Q But it's your recollection that the more students
12 GearUp2Lead had, the more money they would get from the
13 FTE?
14 A Sure. That was something -- When GearUp2Lead was
15 introduced to Fenton Schools, there was a variety of
16 reasons that the board wanted this to be present. One is
17 that Fenton Area Public Schools did not have an
18 alternative ed program. It dissolved years back before I
19 became superintendent, and they were losing many, many
20 students to other school districts that had alternative
21 education.
22       Secondly, they were looking for revenue, ways
23 to bring in more revenue, because enrollment, just like
24 any school in Genesee County, was declining rapidly.
25 Q Yeah.

Page 17

1 A And so that sliding scale was formed to -- for the
2 organization. The more students they brought in and then
3 the more compensation they would need for staffing and
4 other resources to give those students, and so it was
5 a fair scale. So they would benefit as they brought in
6 more School of Choice students.
7 Q Okay. Thank you.
8       Do you know who -- a parent named Abel
9 Patton --
10 A No.
11 Q -- P-A-T-T-O-N? You don't?
12       Okay. Do you know if it's true that she had
13 three children that she enrolled in the GearUp Academy,
14 GearUp2Grow; D[redacted] H[redacted], Z[redacted] H[redacted] and
15 J[redacted] P[redacted] H[redacted]? Do you know if that's true?
16       MS. HAZEN: Object to form and foundation.
17       MS. PIPER: I'll join. Thank you.
18       MR. TOM PABST: Well, what I'm asking is does
19 he know if it's true. That is the foundation.
20 Q (BY MR. TOM PABST) But go ahead and answer the question.
21       MS. HAZEN: I think he's testified that he
22 doesn't know who that person is.
23       But go ahead and answer if you can, Adam.
24       THE WITNESS: Those names don't ring a bell. I
25 do not -- I don't recall those students.

Page 18

1 Q (BY MR. TOM PABST) Okay. Do you know if it's true that
2 in connection with enrolling her kids in the GearUp2Grow,
3 she specifically spoke with Richard Thompson, known as
4 RKT? You know who that is, correct?
5       MS. HAZEN: Same objection.
6       MS. PIPER: I'll join.
7 Q (BY MR. TOM PABST) You don't know who Richard Thompson,
8 RKT, is?
9 A I do know -- I do know Richard Thompson, yes.
10 Q Okay. That she spoke to RKT and Winston Stoody regarding
11 enrolling her children in the GearUp2Grow; do you know
12 anything about that?
13       MS. HAZEN: Same objection.
14       MS. PIPER: I'll join.
15 Q (BY MR. TOM PABST) Go ahead, Mr. Hartley.
16 A No. As superintendent of schools, I -- I was not privy
17 to those -- of the day-to-day, in-the-trenches
18 conversations.
19 Q Okay. And then do you know if it's true that both RKT
20 and Winston Stoody told Patton that if she wanted to
21 enroll her children into GearUp -- GearUp2Grow, she had
22 to waive her children's IEP's outlining the special
23 education services support they were entitled to because
24 GearUp2Grow was not certified to perform such special ed
25 services? Would that be a true statement?

Page 19

1     MS. HAZEN:  I'm going to object to form and
2  foundation again.
3     MS. PIPER:  I'll join.
4  Q  (BY MR. TOM PABST)  Go ahead, Mr. Hartley.
5  A  I'm -- I don't know that, no.
6  Q  But according to your testimony, that shouldn't happen,
7  correct?
8     MS. HAZEN:  Same objection.
9     MS. PIPER:  Join.
10    THE WITNESS:  I believe that was Winston's
11 testimony that he said that shouldn't happen.  I did not
12 say those words.
13 Q  (BY MR. TOM PABST)  Okay.  Well, are you -- do you say
14 that it shouldn't happen now?
15 A  I would say -- I -- I don't -- I'm unaware of that, and
16 I -- and I would not advocate or encourage anybody to
17 tell a parent that they can take their student out of
18 special ed.
19 Q  Okay.  Why not?
20 A  It's just not best practice.
21 Q  Okay.  Why isn't best practice?
22    MS. PIPER:  Asked and answered.
23    Go ahead.
24    MS. HAZEN:  Join.
25 Q  (BY MR. TOM PABST)  Go ahead, Mr. Hartley.  You can

Page 20

1  answer it.
2  A  As a former teacher, principal, assistant superintendent,
3  superintendent, executive director of alternative ed, I
4  myself would never talk to a parent and encourage them to
5  take them out of anything that may give them the supports
6  that they need.
7  Q  Okay.  All right.  Were you aware that Winston Stoody
8  specifically told Abel Patton that she had to waive her
9  children's IEPs and asked her to sign a paper saying she
10 was waiving those services?  While she didn't have the
11 paper, she did have text messages between Adam and Nicole
12 Hartley asking for a copy of, they quote, "Revocation of
13 special services that I signed."
14    Do you recall any text messages between you and
15 Nicole regarding a revocation of special services that
16 was signed by Abel Patton?
17    MS. HAZEN:  I'm going to object to form and
18 foundation of the question.
19    MS. PIPER:  I'll join.
20 Q  (BY MR. TOM PABST)  Go ahead.  You can answer,
21 Mr. Hartley.
22 A  Just to make sure, because there is a little delay, and
23 Mr. Pabst, I appreciate you telling me I can answer, but
24 I really want to make sure that Kailen and Lindsay are
25 telling me I can answer.

Page 21

1  So I'm not being -- I'm not being disrespectful
2  to you, sir, but I just want to make sure, because there
3  is a delay, and I tend to talk fast.  So I'm gonna slow
4  down.
5  Q  No, no, I appreciate that.  And thank you --
6     MS. HAZEN:  Thank you.
7  Q  (BY MR. TOM PABST) -- thank you for that.  But here's
8  what's going to happen.  If they do instruct you not to
9  answer, we're going to finish this in court.  You know,
10 we'll just --
11    MS. HAZEN:  No one instructed him not to
12 answer.
13    MR. TOM PABST:  No, that's what I'm saying.
14    MS. HAZEN:  Those are the rules.
15 Q  (BY MR. TOM PABST)  So those are the rules --
16    MS. HAZEN:  You go ahead and answer.
17 Q  (BY MR. TOM PABST)  Those are the rules, Mr. Hartley.
18 Unless they instruct you not to answer, you're required
19 to answer, okay?  So that's it.  And they didn't instruct
20 you not to answer.  So you have to concentrate and then
21 answer the question.  So --
22 A  Okay.
23    MS. HAZEN:  Well, why don't we repeat the
24 question and --
25    MR. TOM PABST:  Be happy to.  Be happy to.

Page 22

1  Q  (BY MR. TOM PABST)  Are you aware of any text messages
2  between you, Adam Hartley, and your wife, Nicole Hartley,
3  asking for a copy of the, quotation marks, "Revocation of
4  special services" that Abel Patton signed?
5     MS. HAZEN:  And it's the same objection.
6     You can go ahead and answer if you're aware of
7  it.
8     MS. PIPER:  And I'll join.  Thank you.
9     THE WITNESS:  Yeah.  I -- I am not aware, I do
10 not recall that.  I -- I will note that if a parent does
11 ask for a -- their child to be removed from special ed,
12 it does have to be in writing.
13    So as an assistant superintendent in Swartz
14 Creek, and I oversaw that, if parents for whatever reason
15 ask for that, it does have to be in writing.  But I do
16 not recall or I'm not aware of any text messaging between
17 Nicole and I.
18 Q  (BY MR. TOM PABST)  Are you, in all your years being
19 associated with GearUp2Lead or GearUp2Grow, do you recall
20 any parent ever being asked to sign a written waiver of
21 IEP rights of their child?
22 A  I do not recall, no.
23 Q  Okay.
24 A  In fact, Fenton Area Public Schools provided services for
25 students that needed special ed.

Page 23

1  Q  Okay. Well, then why would there be a need for
2     GearUp2Lead to ask them to sign a written waiver of IEP
3     rights of the child?
4        MS. HAZEN: Object to --
5        MS. PIPER: Object to the question.
6  Q  (BY MR. TOM PABST) Well, help me to understand that,
7     Mr. Hartley. Why would there be a request for a parent
8     -- ever for a parent to waive the IEP rights of the
9     child --
10       MS. HAZEN: Objection to the form.
11 Q  (BY MR. TOM PABST) -- if they could just have them go to
12    Fenton schools?
13       MS. HAZEN: Object to form.
14       MS. PIPER: And I'll join. Thank you.
15       MS. HAZEN: Go ahead, if you can, Adam.
16       THE WITNESS: Sure. I can't speak for GearUp.
17    I can speak in general that there's a lot of families
18    that, for whatever reason, don't trust special ed
19    services in whatever school district that their child was
20    in; that when they choose an alt ed program or a virtual
21    school, they don't want their child to go to, whether
22    speech therapy, OT, whatever -- whatever supports that
23    are in there, and there are actually families that would
24    go to school districts and say, "My child has an IEP. I
25    don't want those services."

Page 24

1     I cannot answer your question specific to
2     GearUp. I was not privy to day-to-day operations,
3     conversations that were happening. I -- I was unaware of
4     those.
5  Q  (BY MR. TOM PABST) You know, Abel Patton says she
6     contacted the Michigan Department of Education,
7     specifically a lady by the name of Judy Lindstrom, who
8     says she contacted you. Do you have any recollection of
9     that?
10 A  I -- I was never contacted by a -- a Julie (sic)
11    Lindstrom, no.
12 Q  Okay. Well, I'm --
13 A  And I don't --
14 Q  -- reading from an email from Judy Lindstrom dated
15    December 9, 2024. And she says to Mrs. Patton, "You
16    might also consider contacting Fenton Superintendent Adam
17    Hartley, ahartley@fentonschools.org, or (810) 591-4700."
18       Are those your contacts? Is that your -- your
19    email and your telephone number?
20 A  What date was that?
21 Q  December 9, 2024. I'm sorry. Excuse me. Excuse me.
22    October 27, 2021.
23 A  ahartley@flushing -- or at fentonschools.org, and I don't
24    recall my phone number but --
25 Q  Well, it says (810) 591-4700.

Page 25

1  A  I believe that's the general number for the
2     administrative office.
3  Q  Okay.
4  A  That might --
5  Q  She says, "You might also consider contacting Fenton
6     Superintendent Adam Hartley... since he has been
7     alerted --" he has been alerted -- "to the possibility
8     that a parent had to relinquish special education rights
9     to enroll in GearUp2Grow."
10       Does that ring a bell of a conversation you had
11    with Judy Lindstrom?
12 A  I don't recall a conversation with somebody by that name,
13    no.
14 Q  Okay. Is it true that part of the pattern and practice
15    of GearUp Academy is to have a parent sign away the
16    child's rights to receive special ed services and
17    supports?
18       MS. HAZEN: Object --
19 Q  (BY MR. TOM PABST) Is that --
20       MS. HAZEN: Object to form, foundation, asked
21    and answered.
22       MS. PIPER: I'll join. Thank you.
23       MR. TOM PABST: I never asked him about pattern
24    and practice.
25       MS. HAZEN: You've asked repeatedly about the

Page 26

1     practice and --
2        MR. TOM PABST: Well, sorry.
3        MS. HAZEN: -- he's answered.
4        MR. TOM PABST: No, I haven't.
5        MS. HAZEN: But go ahead, Mister --
6  Q  (By MR. TOM PABST) But go ahead and answer the question,
7     Mr. Hartley. She's not instructing you not to answer.
8     Unless she does, you've got to answer, okay?
9  A  No.
10 Q  You wouldn't let that be a pattern and practice at
11    GearUp2Lead if you had anything to say; isn't that true?
12    You wouldn't let that happen?
13       MS. PIPER: Object to form, foundation.
14       Go ahead.
15       MS. HAZEN: Join.
16       THE WITNESS: That was not a pattern or
17    anything that I was aware of. And I'm -- I'm not aware
18    that was happening or a pattern, no.
19 Q  (BY MR. TOM PABST) Okay. If you had become aware that
20    it was a pattern and practice, would you have said, "No,
21    you can't do that, don't do it"? Would you have said
22    that?
23       MS. PIPER: Object to form, foundation, calls
24    for speculation.
25       Go ahead.

Page 27

1  Q  (BY MR. TOM PABST) Yeah, go ahead.
2         MS. HAZEN: Join.
3         Go ahead, Mr. Hartley.
4         THE WITNESS: Yeah, it's safe to say that all
5  the positions I've held in education that's the
6  philosophy that I took, correct.
7  Q  (BY MR. TOM PABST) That you wouldn't have allowed that
8  to happen, correct?
9         MS. PIPER: Same objections. Go ahead and --
10        MS. HAZEN: Join. Go ahead.
11        THE WITNESS: Yeah, that would not be something
12 that I would bring to the table. And I certainly would
13 have that conversation if a family came to me and talked
14 about what services were being provided compared to, you
15 know, other programs they were looking at. I've had
16 those conversations, not with GearUp, but in other
17 positions I've had.
18        But, no, I would not be the one that would
19 start that conversation or bring that to their attention.
20 Q  (BY MR. TOM PABST) I'm not sure what your answer was on
21 that. Could you please help clarify that.
22        So, if you had become aware that there was
23 pattern and practice at GearUp Academy to getting parents
24 to waive the IEP of the kids, you would have stepped in
25 and said, "Don't do that. Do not do that." Correct?

Page 28

1         MS. PIPER: Same objections; asked and
2  answered.
3         Go ahead.
4         MS. HAZEN: Join. Go ahead.
5         THE WITNESS: Yes.
6  Q  (BY MR. TOM PABST) Okay. Thank you. Thank you, Mr.
7  Hartley.
8         Now, I'm looking at some text messages here.
9  "Nicole Hartley," Tuesday October 27, 2020, 12:56 p.m.
10 and it's got, "Hey lady, did you get the revocation of
11 special services letter from Abel?"
12        "Hi. I think I have it. Let me check."
13        And then by you, "Golen needs it." That's Jim
14 Golen, right? Jim Golen?
15 A  Yes.
16 Q  Okay. Then it's got, "Okay. Will send it over to him."
17        "Awesome. Thank you."
18        And then, "Liked 'Awesome. Thank you.'"
19        Do you recall that type of text message between
20 you and Nicole?
21 A  I -- I don't recall. But like I said, there's --
22 there's two things going on. One is families do ask for
23 that. And if that's something that families want, and
24 then it has to be in writing.
25        So, I -- so I answered you and said I would not

Page 29

1  bring that up. I would not encourage people to sit
2  families down and coach them. But if families do go to a
3  school district and say, "I do not want my student in
4  special ed," we have to have that in writing.
5  Q  Okay. But as far as you know, that was their demand made
6  by the staff of GearUp Academy, correct? That was never
7  a demand made by the staff that the parent had to do
8  something before the child could be enrolled, correct?
9  A  I would not be aware of that, and I -- I'm not aware of
10 that, no.
11 Q  You know, do you recall this email from Jim Golen: "Just
12 FYI you guys. This morning I ran over to the sped office
13 and rummaged through the --" What is the sped office?
14 A  Special ed office.
15 Q  Okay. "... I ran over to the sped office and rummaged
16 through the old files and found the signed copies of the
17 special services withdraw Abel wrote. Amanda had already
18 sent the CA60s to Beecher, so I was sweating."
19        Do you have any idea what that means?
20 A  No.
21 Q  Okay. It goes on, "Abel Patton also confirmed her parent
22 login to OW two years ago giving her access to her
23 students scores or lack thereof. It doesn't take away
24 that -- that T is a dipshit."
25        Who's T? Is that RKT?

Page 30

1  A  I don't know.
2  Q  Okay. It says, "It doesn't take away that T is a
3  dipshit, but we can say that she had to physically
4  confirm her login, and she had access to grades and
5  progress."
6         And then answer by you text back, "Yessssssss
7  you da man great job, G!"
8         Do you recall writing that?
9  A  No.
10 Q  Okay. Not something you would say?
11 A  I don't recall writing that.
12 Q  Okay. Then it goes on, it's got, "Adam Hartley.
13        "You had me at T is a dipshit. Thank you."
14        Do you recall writing that?
15 A  No.
16 Q  And then Jim Golen says -- Oh, and then Golen said,
17 "LMAO," laugh my ass off, "ditto."
18        And then Jim Golen says, "I started putting it
19 together that we were going to be in trouble when she got
20 the whole FHS main office in a tizzy looking for records
21 and they had already sent them to Amanda."
22        Do you have any idea what's being referred to
23 there?
24 A  I'm guessing CA60s, student records, if this particular
25 student's going to another school district.

Page 31

1  Q  Well, what does he mean -- any idea what he means there:
2     "I started putting it together that we were going to be
3     in trouble..."?  Any idea what he means by that?
4  A  No idea.
5  Q  Okay.  And then Adam Hartley, "Thank you."
6        And then Winston Stoody, "Thanks, Jim.  The
7     Christmas booze box may come early this year."
8        And then Jim Golen says, "Hell, yes.  We might
9     open -- crack open that box right in the parking lot."
10       Do you recall that conversation?
11 A  I don't.
12 Q  Jarrett's going to put some LARA reports up there so you
13    can take a look at them, Mr. Hartley.  It's -- it looks
14    to me like you signed corporation online filing systems
15    for Department of Licensing and Regulatory Affairs, LARA,
16    for the years 2017 to 2021 as president of GearUp2Lead.
17    But I just want to confirm that, okay?
18       Go ahead and take a look at these documents,
19    sir.  2017.  Yeah, it's 2017 there.  It's got -- Do you
20    recall signing that form on behalf of GearUp2Lead?
21 A  I -- I do recall signing that since I -- when it started
22    in 2000 either '14 or '15, and I do recall checking to
23    see how to transfer that over.  I didn't understand how a
24    501(c)(3) is transferred.  And I do recall signing even
25    though I had left GearUp as the executive director, yes.

Page 32

1  Q  Okay.  Is that what GearUp2Lead was, was a 501(c)(3)
2     entity?
3  A  Yes.
4  Q  Okay.  And then it looks like you signed for GearUp2Lead
5     not only 2017 but '18, '19, '20 and '21 from the records
6     I've got here.  Would that be true, Mr. Hartley?
7  A  Can I see my signature, please.
8  Q  I -- I don't know.  This is -- this is what I have right
9     here.  But it says -- there's a box here saying sig --
10    looks like online.  You did this online.  So it's got,
11    "Signature:  Adam Hartley, President."  You were
12    president, correct?
13 A  I did a -- I did a term of president or -- I know Al
14    Perry was president.  Nita Kulkarni was president.  So I
15    don't believe those years match up, and I don't -- I
16    don't recall if I would have gone and electronically
17    signed or how that occurred.  I don't know.  I don't
18    recall.
19 Q  Well, okay.  But what I'm asking is, there it's got,
20    "Signature:  Adam Hartley, President."  It has it every
21    year on these annual reports from 2017 to 2021.  Were you
22    president each and every year of GearUp2Lead from 2017 to
23    2021?
24 A  I -- I don't recall.  I -- I have had different
25    positions, including president.  I don't recall.  I may

Page 33

1     have been.
2  Q  Okay.  It's got "Residence or business address:  1005
3     Birchwood Drive, Flushing, Michigan, 48433, USA."  Was
4     that your residence?
5  A  It was, correct.
6  Q  Okay.  It's got that listed for each year from 2017 to
7     2021.  You can take a look at it if you want to.  It's
8     got, "President:  Adam Hartley, Treasurer:  Julie
9     Forbush."
10       Do you know who Julie Forbush is?
11 A  Yes.
12 Q  Okay.  Was she treasurer?
13 A  I recall Julie -- I believe so.  She worked for Sovita
14    Credit Union.
15 Q  Okay.  And then it's got "Secretary Emily Leonard."
16       Was Emily Leonard the secretary?
17 A  I -- I believe at some point.
18 Q  Okay.  Then it's got three directors:  Al Perry, Nita
19    Kulkarni and Angela Izzo-Green.
20       Do you recall them being directors at the time
21    you were president?
22 A  At some point, yes.  There were -- there were a variety
23    of board members that came and -- and went over a period
24    of years.
25 Q  Okay.

Page 34

1  A  And they sat on the board at some point, yes.
2  Q  Okay.  So are you saying that -- You're looking at -- I'm
3     looking at these annual reports and everything.  Are you
4     saying that you personally did not sign this?  Even
5     though it says, "Signature:  Adam Hartley," are you
6     saying you didn't sign this?
7  A  I'm not saying that.  I just don't recall, um, I -- I --
8     I -- that's why I want to say where's my signature?  I
9     don't recall signing a piece of paper or anything of that
10    nature.
11 Q  Okay.  You know, did there ever come a time, Mr. Hartley,
12    where you wanted Kelly Rodgers to take over the middle
13    school?
14 A  No.
15 Q  Do you know if Kelly Rodgers was qualified to take over
16    the middle school?
17 A  Well, in the way the organization was meant to be, when
18    you say taking over the middle school, that depends.  So
19    if the students are taking virtual classes online and
20    overseeing students to make sure they were cared for,
21    their basic needs were being met, teaching growth
22    mindset, then any human being that wants to work for kids
23    can work with middle school students.  But if it means
24    teaching the courses, math, science, English, you'd have
25    to be a certified teacher.

Page 35

1 Q   Okay. Was Nicole a certified teacher?
2 A   She's a certified teacher, yes.
3 Q   Okay. So you're saying she was qualified to take over
4     the middle school and teach the kids in middle school,
5     correct?
6         MS. HAZEN: Can you clarify if you're talking
7     about Kelly or Nicole.
8         MR. TOM PABST: I'm talking about Nicole.
9         MS. HAZEN: Okay.
10        MS. PIPER: Okay. You were talking about
11    Kelly, I believe, so...
12        MS. HAZEN: Yeah.
13        MR. TOM PABST: Okay. Well, let's be clear.
14 Q   (BY MR. TOM PABST) Did you ever take a position that
15    Nicole was not qualified to teach the middle school?
16 A   No.
17 Q   Did you ever say that she didn't feel comfortable
18    teaching the middle school, Nicole?
19 A   No.
20 Q   When did Nicole become certified to teach the middle
21    school kids? When did she become certified?
22 A   When she graduated at the University of Michigan-Flint.
23    She has a K-8 self-contained. So, again, there's two
24    different things here. She's not certified to teach
25    middle school subjects, particular math, social studies,

Page 36

1     what have you.
2         She is certified to run a self-contained
3     project based, place based, all subjects. So there's --
4     there's -- two certifications for middle school.
5 Q   Okay.
6 A   So, for instance, I'm certified to teach social studies
7     and English at the middle school level. So, 20 some
8     years ago I taught English and social studies to 6th, 7th
9     and 8th graders, because that says I -- I can do that.
10        Nicole couldn't teach specific math or English,
11    but her certification allows her to run a program that
12    she can teach all subjects through project-based and
13    competency-based learning.
14 Q   Okay. You know, when Kelly Rodgers was deposed, she said
15    that she had two meetings with you, okay, specifically.
16    She identified at least these two: April 2022 and July
17    2022. She said at the April 2022 meeting, it was you,
18    Mr. Hartley, Winston Stoody and Kelly, okay? Do you
19    recall that -- having that meeting?
20 A   Yes.
21 Q   Okay. And who called that meeting? What was the purpose
22    of the meeting?
23 A   I, as superintendent of Fenton Schools, always met with
24    community partners, people we had scope of work contracts
25    with. So, I would imagine I called that meeting to go

Page 37

1     over going into the next school year.
2         That meeting was to bring attention to GearUp,
3     that they were not fulfilling the scope of work. It was
4     inadequate services and that they needed to get back to
5     where it was pre-pandemic, meeting with students
6     face-to-face, teaching growth mindset, providing the
7     service of work that they needed to do, or we would not
8     be working with the organization.
9 Q   Okay. You know, when you say they were not providing the
10    scope of something, what are you referring to there?
11 A   Just what I explained when we first started off, and I
12    explained what the Lansing Learning Hub is and what
13    GearUp used to be.
14 Q   Okay. Well --
15 A   Students coming in face-to-face, providing a safe,
16    positive learning environment, teaching growth mindset,
17    teaching empathy, getting these kids jobs, getting them
18    out in the community, cleaning the community parks,
19    everything outside of being on a computer and learning
20    the core subjects.
21 Q   Okay. How did you know that, Mr. Hartley; that
22    GearUp2Lead wasn't providing that type of scope of
23    activities? How did you know that?
24 A   I knew that from conversations with Winston. I knew
25    that -- In fact, Kelly herself walking into that meeting

Page 38

1     told me she had just gotten back from a two-week vacation
2     or something, and she was ready to F-ing go and get with
3     these kids and teach the -- teach the growth mindset.
4         I knew that because the pandemic, all kids were
5     at home. They weren't allowed at school. I had a
6     meeting with Winston either -- I believe it was the fall
7     of '21 to see -- because our kids had come back
8     face-to-face, and he reported to me that they weren't
9     getting kids in face-to-face. It was still very much a
10    virtual setting. And I said, "The pandemic's over," and
11    that the work -- working with GearUp to provide those
12    basic needs, and it wasn't happening.
13 Q   Is that the part that you say is inadequate services
14    they're not doing face-to-face meetings and -- with the
15    kids?
16 A   That was part of it, yes.
17 Q   Okay. All right. So, did you say at this April 2022
18    meeting that Kelly and Stoody have to take over the
19    middle school?
20 A   No, I don't recall that.
21 Q   Okay. Can you think of any reason why you would have
22    made a statement like that?
23        MS. PIPER: Object to form, foundation. He's
24    already testified that he didn't do that.
25        Go ahead.

Page 39

1  MS. HAZEN:  Join.
2  MR. TOM PABST:  Okay.
3  MS. HAZEN:  Go ahead.
4  Q  (BY MR. TOM PABST)  Well, is that true?  That's your
5     testimony, that you never said Kelly and Stoody have to
6     take over the middle school?  You never said that,
7     correct?
8  A  Correct.
9  Q  Okay.  And then did you ever say it to Kelly that she has
10    to take middle schoolers into the 9th grade?  Do you
11    recall saying that to Kelly?
12 A  No.
13 Q  That's not something you would say under any
14    circumstances, correct?
15 A  I don't recall saying that, no.
16 Q  Okay.  And then you certainly didn't say at that meeting
17    Nicole's not certified for middle school?  You didn't say
18    that, correct?
19 A  No, she is certified for middle school.
20 Q  Did you ever say that, "Nicole doesn't feel comfortable
21    with this whole situation with the middle school"?  Did
22    you ever make that comment?
23 A  No.
24 Q  Okay.  And then let's go to the next meeting, July 2022.
25    Now, Stoody's not at that meeting, correct?  It's just

Page 40

1     you and Kelly?
2  A  That's correct.
3  Q  Okay.  Why is that?
4  A  Well, after my April meeting, from what I understand,
5     Winston and Kelly left not in a very good mood.  I had
6     made a statement in that meeting as an example, because
7     that meeting was to point out that the alternative ed
8     program was designed to be more than a virtual school,
9     and that if we were not looking at kids coming in, being
10    out in the community, teaching growth mindset, then there
11    really was no point, and Fenton could run their own
12    virtual school.  Many districts do, especially after the
13    pandemic.
14 Q  Yes.
15 A  And I made a comment to Kelly that she took offense to.
16    And both Winston and Nicole brought to my attention that
17    Kelly was upset.  And so I reached out to Kelly and said,
18    "Can I buy you lunch?"  And I apologized to Kelly for
19    making that comment.
20 Q  Okay.  So you're talking about these comments and Kelly
21    being upset following the April 2022 meeting, correct?
22 A  The one comment I made in the meeting, correct.
23 Q  Okay.  And so that's the reason you had the July 2022
24    meeting with Kelly, correct?
25 A  Yes.

Page 41

1  Q  Okay.  You know, did you ever say to her at that meeting
2     in July 2022, "I could hire someone for $15 an hour to do
3     what you're doing"?  Did you ever make that comment to
4     her?
5  A  That was the -- that was the comment she took offense to
6     in April.  As an example of running a virtual school
7     versus running an alternative ed, that you meet with kids
8     face-to-face every day, that you teach growth mindset,
9     everything else that comes with that scope of work.
10    And I said, as an example, "I could hire
11    somebody to text students and to call students for --"
12    I -- I forget what the comment was or -- or what I may
13    have said.
14 Q  Okay.  Did you ever say to Kelly at that July 2022
15    meeting, "You'll get your raise"?
16 A  I don't recall saying that.
17 Q  Did you consider Kelly Rodgers to be a truthful and
18    honest person?
19 A  I -- I don't -- I never had an opinion on that particular
20    area of Kelly Rodgers.
21 Q  Did you ever know her to do anything that was devious or
22    thievery or stealing or misappropriating something?  Any
23    instances where Kelly Rodgers did something like that?
24 A  No, I -- No, my experiences with Kelly were always her
25    complaining about somebody or she's been wronged.  In

Page 42

1     fact, the meeting in July, it was pretty much taken up by
2     how much she did and how little Winston did.
3  Q  Okay.
4  A  Other than that, I don't know Kelly Rodgers.
5  Q  Okay.  You know, are you aware that Winston Stoody gave a
6     Cadillac automobile to P███ O████'s family?  Are you
7     aware of that?
8     MS. PIPER:  Object to form, foundation.
9     Go ahead.
10    MS. HAZEN:  Join.
11    Go ahead.
12    THE WITNESS:  No, I'm not aware of that.
13 Q  (BY MR. TOM PABST)  Do you know who P███ O████ is?
14 A  I remember P███, yes.
15 Q  What do you remember about P███, I mean, and his
16    education or what might have led Winston Stoody to give
17    him a Cadillac; any idea?
18    MS. HAZEN:  Object to the form of the question.
19    You can go ahead and answer.
20    MS. PIPER:  I'll join.  Thank you.
21    THE WITNESS:  I remember P███ mostly because we
22    had an open house.  I went there with a few Fenton Board
23    members, and his dad stood up and talked about his own
24    experiences in education, how much he appreciated
25    GearUp2Lead and the team.

Page 43

1    And so -- and then the few times I'd stopped
2    into the building on, um, either Saginaw or Martin Luther
3    King -- I forget which road -- I would -- if P___ was
4    there, I said hi to him.
5  Q  (BY MR. TOM PABST)  Okay.  So you don't know anything
6    about P___ O___ or his education or grades or jumping
7    a grade or anything like that, correct?
8  A  No.
9  Q  Okay.  How about T___ B_____?  Do you know him from
10   putting swastikas on the blackboard?
11       MS. HAZEN:  Object to form of the question.
12       MS. PIPER:  I'll join.
13 Q  (BY MR. TOM PABST)  Do you know T___ B_____?
14 A  I remember that name, yes.
15 Q  Did you kick him out of the Fenton schools?
16 A  Yes.
17 Q  Why?
18 A  He -- His suspension did come in front of the Board of
19   Education.  So I should say the Board of Education
20   suspended T___ and -- because I believe he took a
21   picture of one of his buddies using the restroom.  And so
22   the high school principal suspended T___, asked that
23   he be suspended for the remainder of the year, if I
24   recall.  And T___ did come in front of the board
25   committee to -- and then, ultimately, they voted to

Page 44

1    suspend him for a long-term suspension.
2  Q  Okay.  As superintendent, did you recommend that he be
3    suspended too?
4  A  I did.  I was -- so it's -- it's a committee form, me and
5    I believe three board members.  And, yes, that -- I would
6    have been part of that process and recommended long-term
7    suspension.
8  Q  Okay.  After he was suspended from Fenton Area Schools,
9    did he enroll in GearUp2Lead Academy; do you know?
10 A  I do recall I believe he did.
11 Q  Okay.  Any idea how that happened?
12 A  Please clarify.  You want to know the process of
13   enrollment into --
14 Q  Yeah.  Who -- Did somebody direct him to GearUp Academy,
15   or did he just know it on his own or what?
16 A  Actually, the Board of Education during the meeting had
17   mentioned the alt ed possibility.  That's one thing
18   that -- that Fenton and many school districts tried with
19   alternative ed programming while students, unfortunately,
20   behave in ways that remove them from the traditional
21   setting.
22       Most people in education have big hearts and
23   want to give students second chances and not wash their
24   hands of them.  And I recall the school board really
25   wanting to give T___ an opportunity.  I believe his

Page 45

1    father had passed, and I believe another family member
2    had passed right before he was suspended.
3  Q  Okay.  Did he prosper at GearUp Academy; do you know?
4    Did he do well?
5  A  I don't know.
6  Q  Okay.  Did any of the people -- So were you aware of any
7    pupils at GearUp Academy bringing guns to the meetings or
8    school?
9  A  I -- Yes, I recall there was an incident when GearUp was
10   downtown Flint that a student had a gun in his book bag.
11   I do recall that.
12 Q  And who was that?
13 A  I don't -- I don't recall the student.
14 Q  Well, what -- so did he get kicked out of GearUp Academy
15   or what happened to him?
16 A  I don't recall.
17 Q  Okay.  So, how is it that you know that this one pupil
18   brought a gun then?  I mean, were you present?  Did
19   someone tell you or what?  How did you learn of it?
20 A  I believe Winston told me.
21 Q  Okay.  Did Winston tell you what he did about that kid?
22   Like, did he kick him out of GearUp Academy or did he
23   leave him in or what?
24 A  I don't recall.  I -- I think there's maybe -- Let me
25   clarify.  These students were virtual students.  So you

Page 46

1    don't -- he may have told this particular student not to
2    come back to that particular building for a period of
3    time.  I'm not sure how Winston handled that.
4  Q  Yeah.
5  A  But that is the beauty of having a virtual setting for
6    these students.  Because when they do something stupid,
7    you can keep them from coming into the physical building,
8    but they're still able to work on their education from a
9    computer.
10       So when you say be "kicked out of GearUp," that
11   would be up to Winston on whether he allowed him back in
12   the physical building or -- or what have you.  I do
13   not -- I do not recall what happened.
14 Q  Okay.  What do you know about a contract that was entered
15   into between GearUp Academy and Genesee Circuit Court?
16   What do you know about that contract?
17 A  I know that Winston -- I -- I don't recall who or what
18   he -- what the process was.  But Winston led that charge.
19   And there was a contract with Genesee County.  I'm not
20   sure which entity, but it was with Genesee County.
21 Q  Just in a nutshell, how did it work; do you know?  Do you
22   have any idea how the contract worked?  I mean, what did
23   the circuit court get out of it?  What did GearUp Academy
24   get out of it?
25 A  Well, I mean, GearUp, I guess working with students from

Kelly Rodgers 2-23-cv-13110-GAD-CI   ECF No. 39-3, PageID.757   Filed 03/24/25   Page 15 of 19
Rodgers v. Fenton, et al.
14 (47 - 50)

Page 47

1 circuit court, one, you're meeting your mission of
2 working with transient students, students that have not
3 been successful in the traditional setting. I would
4 imagine the circuit court are constantly looking for
5 programming for students that need alternative
6 educational programming.
7 Q  Any idea when that contract was first entered into?
8 A  Well, it was when GearUp was at the church, which would
9 have been pre-pandemic.
10 Q  All right. Any idea when that contract was terminated?
11 A  From my recollection, what I recall is it maybe lasted
12 one school year.
13 Q  One school year? Any idea why it was terminated; that
14 contract?
15     MS. PIPER: Object to the form.
16     Go ahead.
17     MS. HAZEN: Join. Thank you.
18     THE WITNESS: I recall Winston reporting that
19 it just, um, wasn't -- I -- I don't recall specifics, but
20 it just wasn't working out.
21 Q  (BY MR. TOM PABST) Okay. Did you have anything to do
22 with terminating that contract?
23 A  No.
24 Q  Okay. Well, let's go back to that sliding scale
25 arrangement, you know, that GearUp Academy had with

Page 48

1 Fenton Area Schools, okay; the one that Winston Stoody
2 said you -- you created it.
3     When did it end; do you know? When did that
4 arrangement end?
5 A  What -- I'm sorry, what arrangement?
6 Q  Well, the arrangement between splitting of the FTE moneys
7 between GearUp Academy and Fenton Schools? You said
8 there was a sliding scale, and I marked it as an exhibit
9 at Winston Stoody's dep. And he wrote in there in his
10 own handwriting that you created that. I mean, so that
11 relationship went on, I guess, from -- for a number of
12 years, then -- then it ended. I mean, so do you have any
13 idea why it ended?
14 A  The relationship between Fenton and GearUp ended well
15 after I had left the school district.
16 Q  Okay.
17 A  So I -- I -- I don't -- I don't know that.
18 Q  Okay. Did you ever talk with Winston Stoody about why it
19 ended?
20 A  No.
21 Q  Okay. Did you ever talk with anyone at Fenton Area
22 Schools as to why it ended?
23 A  No.
24 Q  You know, I'm holding in my hand here a booklet that's
25 got "Pupil Accounting Manual." Are you familiar with

Page 49

1 that?
2 A  Yes.
3 Q  Okay. And just in a couple sentences, what is the Pupil
4 Accounting Manual? What's your --
5 A  A guideline --
6 Q  I'm sorry. What's your understanding of the Pupil
7 Accounting Manual?
8 A  A guideline for school districts on how to count
9 students, so to speak.
10 Q  Okay.
11 A  So what processes need to take place.
12 Q  Okay. Did GearUp -- Did you take any steps to make sure
13 that GearUp Academy had a handbook which made the staff
14 at GearUp Academy aware of the Pupil Accounting Manual
15 and its requirements? Did you do anything to make sure
16 that GearUp Academy had a handbook?
17 A  I don't -- I don't recall. I wouldn't be in on that.
18 My -- I did meet with our pupil accounting office, made
19 sure that Winston met with our pupil accounting office.
20 We would meet with the state auditors in the fall or late
21 summer to go over any new policies, laws, whatever it may
22 be.
23     So that was -- that was my responsibility as
24 superintendent to make sure whether it was the
25 traditional schools, the alt ed schools, the virtual

Page 50

1 schools, those policies and laws are constantly changing
2 in the state of Michigan. So from year to year, we would
3 review the manual.
4     Anything that went to GearUp, I do vaguely
5 remember Winston creating a -- I don't know if it was a
6 student manual or a staff manual but --
7 Q  Did you ever examine it to see if it comported with or
8 complied with the Pupil Accounting Manual that the state
9 puts out?
10 A  I don't recall doing that.
11 Q  Do you know if anyone at GearUp Academy made any effort
12 to see if they're -- whatever document they produce was
13 in compliance with the Pupil Accounting Manual?
14 A  I -- I don't know. I -- I don't recall. Like I said, my
15 part was sitting down with our pupil accounting office,
16 the Genesee Intermediate School District auditor, to go
17 over what needed to be done in all of our schools, all of
18 our programming.
19 Q  Who's that person in the pupil accounting department you
20 referred to? Who's the person that runs that?
21 A  When I first started in Fenton, it was Chris Hay. And
22 then when I left, it was Amanda Mogford and Linda
23 Vollick.
24 Q  Okay. Are these the people you sat down with and
25 discussed whether or not GearUp Academy was in compliance

Page 51

1  with Pupil Accounting Manual requirements?
2  A  Well, that happened in the spring during the audits that
3     each school district receives.
4  Q  Okay. You know, in it there's an Appendix C2 which
5     says -- Exhibit 2. They actually give an sample of a
6     two-way interaction form. It says two-way communication
7     log that's supposed to be filled out, you know, by --
8     student summary questions; you know, what's your plan to
9     online schedule.
10         Was GearUp Academy actually complying with this
11    two-way communication log and doing this with the
12    students?
13         MS. PIPER: I'm going to object to form,
14    foundation.
15         MS. HAZEN: I'll join.
16         I also want to clarify for the record, Tom,
17    what version of the Pupil Accounting Manual are you
18    pulling from?
19         MR. TOM PABST: This has got 2024-2025.
20         MS. HAZEN: Okay.
21 Q  (BY MR. TOM PABST) So my question to you is, Mr.
22    Hartley, it's got a form in there that's supposed to be
23    filled out regarding each pupil. It's got two-way
24    communication log. Are you familiar with that document
25    that's in the Pupil Accounting Manual?

Page 52

1  A  Not that particular one. That changes from year to year.
2     But I am familiar that the state will include templates
3     as -- so schools can either use that particular template.
4     But I will tell you schools do it in a variety of ways.
5     The auditors don't care what template or how it's done.
6     They just care that it's done.
7         So some schools would do it electronically
8     within their student informational system. They may use
9     a Google form. They may do a handwritten. So, I'm
10    familiar that within the student's accounting guide,
11    Pupil Accounting Guide, it doesn't surprise me that --
12    that there's examples.
13 Q  Okay. Are you aware of any GearUp2Lead handbooks saying
14    that this form or a form like this has to be filled out
15    and a log kept? Are you aware of any handbook that
16    GearUp Academy had saying that?
17 A  I -- I don't --
18 Q  Whatever form. Whatever form. You say it could be any
19    form. It could be yellow pad. It could be scratch
20    paper. I get that. But are you aware of any -- any
21    handbook for GearUp Academy that says you've got to
22    finish -- you've got to do a communication log and keep a
23    log. Are you aware of any such document?
24 A  I don't recall a document.
25 Q  Well, do you recall any type of handbook for GearUp

Page 53

1     Academy that laid this out and spelled it out that you've
2     got to do a communication form like this and keep a log
3     of it? Are you aware of any such thing like that?
4  A  I'm sorry. What I -- what I recall is me meeting with
5     the pupil accounting office, going over what needs to be
6     done, and Winston being in those meetings.
7  Q  Okay. But my question is, was Winston complying with
8     this, or was he not doing it when he should have been
9     doing it?
10         MS. PIPER: I'm going to object to the form,
11    foundation.
12         Go ahead.
13         MS. HAZEN: Join. Thank you.
14         THE WITNESS: The years I was superintendent of
15    Fenton Area Public Schools, all of our audits went very
16    well. And like I said, we met with the state auditor in
17    the fall. Said okay. Has anything changed? How do we
18    go about this?
19         And then when we were audited in the spring,
20    there were never any issues with state audits, whether
21    that was GearUp students or whether that was our
22    traditional students.
23 Q  (BY MR. TOM PABST) Well, thanks for that information,
24    but that's not my question.
25         My question is, isn't it true Winston Stoody

Page 54

1     was not complying with this two-way communication log?
2     He was not keeping them in any log because he was not
3     meeting with the students as this pupil manual says;
4     isn't that true?
5         MS. PIPER: I'm going to object to form,
6     foundation, asked and answered.
7         MS. HAZEN: Join. Thank you.
8         THE WITNESS: I don't recall that being an
9     issue, no. In fact, two-way communication can happen
10    over the phone, via text, via email, or face-to-face.
11 Q  (BY MR. TOM PABST) Did you ever make a complaint in
12    front of Kelly Rodgers that Winston Stoody was not doing
13    this two-way communication log when he should have been
14    doing it? Do you recall ever making that complaint in
15    the presence of Kelly Rodgers?
16 A  No.
17 Q  Well, was Winston Stoody's performance efficient in any
18    way in your judgment?
19         MS. PIPER: I'm going to object to the form of
20    the question.
21         Go ahead.
22         MS. HAZEN: I'll join. Thank you.
23         THE WITNESS: Yes. Both Winston and Kelly's
24    performance was inadequate leading to the April of '22
25    meeting. And I think I communicated that, that we were

Page 55

1    not happy with the services they were providing, and that
2    they had to get back to pre-pandemic where they were
3    meeting with students on a daily basis, finding them
4    jobs, teaching growth mindset, and get back to what the
5    original scope of work consisted of. Because, if it was
6    just going to be a virtual school that we, as Fenton
7    Schools, especially during the pandemic could do that on
8    our own without any other entity helping oversee that
9    in-person and -- and that community-based education.
10 Q  (BY MR. TOM PABST) No, I -- I appreciate that. And
11   thank you for that.
12       But isn't that exactly what this two-way
13   interaction form is for; to log a face-to-face meeting
14   with the pupil? Isn't that exactly what this two-way
15   communication log that's supposed to be kept is for?
16   That's the purpose of it, isn't it?
17       MS. PIPER: I'm going to object to the form of
18   question. Foundation as well.
19       MS. HAZEN: Join. Thank you.
20       MS. PIPER: Go ahead.
21       THE WITNESS: Sure. I -- Okay. I'll -- I'll
22   repeat this and I -- I'll try to be more clear so that --
23   Maybe I wasn't clear enough. My apologies.
24       Two-way communication can occur in a variety of
25   ways. One is face-to-face having a conversation with

Page 56

1    that student. Another is via text. Another is a phone
2    call or another is via email.
3  Q  (BY MR. TOM PABST) Right.
4  A  Or maybe Zoom like we're doing now or Google Meets or
5    what have you. There's a variety of ways to -- to
6    interact with virtual students. When I say face-to-face,
7    it goes beyond two-way communication. I'm talking about
8    helping provide those basic needs, building trusting
9    relationships, getting to know the students, and making
10   sure that they're successful in feeling that they're part
11   of a community, and that they're building empathy and
12   having a growth mindset. That's what the "Gear" stands
13   for.
14 Q  Okay. Do you know if GearUp Academy kept educational
15   development plans for the pupils?
16 A  To my knowledge, they did.
17 Q  Okay. And who would have possession of those right now?
18 A  Fenton Area Public Schools. I don't know how long you
19   have to have those in record. Many school districts use
20   plat -- electronic platforms. But the EDP isn't
21   something that would follow a student off to college.
22   It's not something that necessarily colleges look at.
23   It's more for the individual student to understand what
24   their skill sets, what careers they want to tackle, and
25   so on.

Page 57

1    So I would imagine those EDPs are housed in
2    some, you know, where other electronic records are housed
3    in school districts.
4  Q  Okay. If the judge or -- or the other people, Lindsay or
5    Kailen, wanted to see some two-way communication logs,
6    you know, that were filled out by GearUp Academy, whether
7    it was done on yellow paper, scratch paper, the back of
8    an envelope, whatever, who would we go to see to get
9    those records?
10 A  That would be -- that would be the school district; the
11   pupil accounting office.
12 Q  And what person in that office would keep those records,
13   those communication logs?
14 A  What -- what I was -- When I was there, like I said, it
15   would have been probably Chris Hay or Linda Vollick.
16 Q  Okay. And if we want to see the educational development
17   plans that GearUp Academy had for its pupils, who would
18   be the person we would want to see on that?
19 A  I don't know. I -- I've been away from Fenton Schools.
20   I -- I don't know who would they would have put in
21   charge.
22 Q  Well, when you were with Fenton -- when you were with
23   Fenton Schools, and when you were president, you know, of
24   GearUp Academy, who had possession or custody of the
25   educational development plans for the pupils?

Page 58

1  A  That may have fallen on Jim Golen with Google Form. But,
2    also, the older students used I think it's called -- I
3    believe it was Zello. So I don't know. Again, I don't
4    know if those records, um, are there. I -- I'm not
5    sure -- they have to be -- it's -- I don't -- I don't
6    believe it's an academic record that once the student
7    graduates they have to be necessarily held onto like
8    other academic records.
9  Q  Yeah. I'm looking at virtual learning options, and it's
10   Number 5-0-D-1 from the Pupil Accounting Manual. And it
11   says that to satisfy the participation requirement --
12   well, first bullet point, "The pupil and the teacher of
13   record or mentor must complete a two-way interaction for
14   one course per week for each week of the four-week count
15   period." And it says see the description of the two-way
16   interaction in the section.
17       Do you know if GearUp Academy complied with
18   that?
19       MS. PIPER: I'm going to object to the form,
20   foundation.
21       MS. HAZEN: I'll join. Thank you.
22 Q  (BY MR. TOM PABST) What's your answer, Mr. Hartley?
23 A  To my knowledge, yes, they did.
24 Q  Okay. You know, it also says on the next page, "Where
25   two-way interactions are not being used for participation

Page 59

1 purposes, if a pupil is absent from or does not
2 participate in one or more courses under this section on
3 Count Day, the pupil must attend and participate in each
4 class during the next 10 consecutive school days if the
5 absence was excused or during the next 30 calendar days
6 if the absence was unexcused."
7 　　　Do you have any idea if GearUp Academy followed
8 and complied with that rule?
9 　　　MS. PIPER: Same objection.
10 　　　Go ahead.
11 　　　MS. HAZEN: Thank you.
12 　　　THE WITNESS: Okay. To my knowledge, they did.
13 Q (BY MR. TOM PABST) When you say to your knowledge, what
14 　is your knowledge? What are you basing it on?
15 A Our pupil accounting audit. So as superintendent of a
16 　school district with over 3,000 students, the state comes
17 　in. They audit the records. They spot-check students.
18 　They do desk audits, which they meet with the individual.
19 　　　I do recall Winston being a part of those
20 　audits when the auditors would come in. So my knowledge
21 　is based on whether those audits were what I called
22 　"clean audits," and they were.
23 Q Okay. Who has the audit records? Who would we want to
24 　go talk to for the audit records if we wanted to look at
25 　them?

Page 60

1 A I would imagine the pupil accounting office should have
2 　records of all the audits that take place.
3 Q Okay. It's also got on page 5-A-2 of the Pupil
4 　Accounting Manual, "For an alternative education learning
5 　lab, the pupil must be scheduled for a specified number
6 　of lab hours per day and attendance is recorded to
7 　document the actual number of hours per week that the
8 　pupil attended."
9 　　　Do you know if GearUp Academy or Fenton Area
10 　Schools was complying with this requirement?
11 　　　MS. PIPER: Object to form, foundation.
12 　　　Go ahead.
13 　　　MS. HAZEN: Join. Thank you.
14 Q (BY MR. TOM PABST) Yeah, go ahead, Mr. Hartley.
15 A Mr. Pabst, could you -- could read that again because
16 　I --
17 Q Yeah.
18 A -- a lot of --
19 Q I'd be happy to. It's got, "For an alternative education
20 　learning lab, the pupil must be scheduled for a specified
21 　number of lab hours per day and attendance is recorded to
22 　document the actual number of hours per week that the
23 　pupil attended." In other words, there's got to be some
24 　documentation that the pupils there are doing this work.
25 　　　I mean, so my question was, do you know if

Page 61

1 GearUp Academy or Fenton Area Schools complied with this?
2 　　　MS. PIPER: Same objections.
3 　　　Go ahead.
4 　　　MS. HAZEN: Join. Thank you.
5 　　　THE WITNESS: Yeah. I'll speak from the
6 knowledge I have. And that's -- you're -- you're talking
7 about two -- there's -- there's two different things
8 there. There's the -- a learning lab is meaning you're
9 taking attendance in person just as you would if a
10 student's sitting in a classroom in the traditional
11 setting. Many districts do hold their alternative
12 education programs where students come in five hours a
13 day, and they're in a lab, and they may be taught hybrid
14 so there's certified teachers come in to teach algebra.
15 And then they take some classes online. There's a
16 variety of different ways.
17 　　　From what I heard you read, and from my
18 understanding, that is not the same programming that
19 Fenton was providing virtual students in contracting with
20 GearUp to oversee the basic needs and the -- and the
21 teaching of the Gear concepts and so on.
22 Q (BY MR. TOM PABST) Okay. Are you aware of any handbook
23 　in writing that GearUp Academy ever had from 2017 to the
24 　time -- 2023? Are you aware of any handbook GearUp
25 　Academy ever had?

Page 62

1 A The only handbook that I'm picturing right now and -- and
2 　recall is a student handbook that -- that Winston Stoody
3 　created.
4 Q Okay. And where would we go to get a copy of that
5 　handbook? I mean, who would have it?
6 A I would imagine Mr. Stoody.
7 Q Okay. But you saw it and you know it exists, correct?
8 A I recall seeing a student handbook, yes.
9 Q Did he ever give you a copy of it for you to read and
10 　examine?
11 A I recall him -- Yeah, I recall a meeting, and it was like
12 　in the summer before the school year, and he showed me
13 　that he was creating -- was creating a student handbook.
14 Q Well, what year was that, roughly; do you recall?
15 A I believe it was before the pandemic.
16 Q Okay. Do you know if that handbook was handed out to the
17 　pupils?
18 A I -- I can't tell you whether it was handed out or not.
19 　I -- I can make an assumption.
20 Q Well, do you have any idea whether it was handed out to
21 　the staff? Like, did Kelly Rodgers get a copy of that?
22 A I don't know.
23 Q Okay. Did he say what the purpose was for him to create
24 　this handbook?
25 A I don't recall the specific conversation. I know he -- I

Page 63

```
 1  know it was in the -- you know, the -- the thought was
 2  organization, um, processes, when students come in, you
 3  know, teaching them how to obviously use the online
 4  curriculum and just trying to shore things up when it
 5  came to organization and process.
 6  Q   Okay.
 7          MR. TOM PABST:  Give me just a minute, okay?
 8  I'll be right back.  Couple of minutes.
 9          (Discussion off the record.  Recess taken
10           at 11:26 a.m.  Deposition resumed at or
11           about 11:28 a.m.)
12  Q   (BY MR. TOM PABST) All right.  Mr. Hartley, just a few
13  more questions.  That's it.
14          GearUp Academy, when you had board meetings,
15  somebody took minutes for those meetings, didn't they?
16  A   I believe so.
17  Q   Would that have been the secretary?
18  A   Typically, I believe so, yes.
19  Q   Yeah.  So, any idea where the minutes are for GearUp
20  Academy, you know, for like the years 2017 to 2022?  I
21  mean, are those records kept by somebody?
22  A   I -- I would imagine the -- I would imagine the secretary
23  would have them.
24  Q   Okay.  How often did GearUp Academy and the board, meet?
25  Do they meet monthly, or was it less than that?
```

Page 64

```
 1  A   I -- I think maybe the -- the thought was to meet
 2  monthly, but there were some months that the board did
 3  not meet.  There were times I didn't go to board
 4  meetings.  There were times where I was there and other
 5  board members didn't attend.
 6          So, um, you know, I -- I would say sporadic --
 7  you know, maybe try to meet monthly.  But there were
 8  times where they didn't meet.
 9  Q   Okay.  When you did meet, did you usually have an agenda
10  and also the minutes from the previous meeting to
11  approve?  Do you recall if that was the procedure?
12  A   I recall that was the procedure, yes.
13  Q   Okay.  Did you yourself ever keep the minutes of these in
14  some notebook, or no?
15  A   No.  No.  I was -- I don't recall ever taking minutes.
16  Q   Okay.  All right.
17          MR. TOM PABST:  Just a second.
18          Okay.  That's all I have.
19          Thanks, Mr. Hartley.
20          I'll pass the witness.
21          MS. HAZEN:  Kailen, do you have any?
22          MS. PIPER:  No, I do not have any questions.
23          Thank you, Adam.
24          MS. HAZEN:  I just have a couple clarifying
25  questions, Adam.
```

Page 65

```
 1          EXAMINATION
 2  BY MS. HAZEN:
 3  Q   When counsel has referred to you as president of
 4  GearUp2Lead, what were you president of?
 5  A   The board.
 6  Q   Okay.  So you weren't president of the company; you were
 7  president of the board of GearUp2Lead?
 8  A   Correct.
 9  Q   And in that role, did you have any more authority than
10  other board members?
11  A   No.
12          MS. HAZEN:  That's all I have.
13          MR. TOM PABST:  Okay.  Nice meeting you, Mr.
14  Hartley.
15          MS. PIPER:  Thank you.
16          MS. HAZEN:  Thank you.
17          (Deposition concluded at 11:31 a.m.)
```

Page 66

CERTIFICATE OF NOTARY PUBLIC

DEPONENT:  ADAM J. HARTLEY         (STATE OF MICHIGAN)
RECORDED:  January 13, 2025        (      SS      )
LOCATION:  Via Zoom                (COUNTY OF GENESEE)

Being a Notary Public duly commissioned and qualified in and for the State of Michigan at Large, I do hereby certify that pursuant to notice there came before me the deponent herein, who was by me first duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause.

Being thereupon carefully examined under oath, said examination was recorded stenographically and was later reduced to transcription under my supervision; said transcription being a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto subscribed my signature this 23rd day of January, 2025.

_____
David S. Ripka, CSR-2175

MY COMMISSION EXPIRES:
December 29, 2028