# EXHIBIT 11

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MICHIGAN
 2                      SOUTHERN DIVISION

 3

 4   KELLY RODGERS,

 5            Plaintiff,
                                        CASE NO. 2:23-cv-13110
 6   vs.
                                        JUDGE GERSHWIN A. DRAIN
 7   FENTON AREA PUBLIC SCHOOLS,
     GEARUP2LEAD, a Domestic Nonprofit
 8   Corporation, ADAM HARTLEY,
     individually and in his official
 9   capacity as Superintendent, and
     WINSTON STOODY, individually and
10   in his official capacity as
     Executive Director,
11
              Defendants.
12   _____/

13

14         DEPOSITION OF NICOLE M. HARTLEY VIA ZOOM

15

16     Taken by the Plaintiff on the 13th day of January, 2025,

17     via Zoom Video Conferencing, commencing at or about

18     11:38 a.m.

19

20   APPEARANCES:

21

22   For the Plaintiff:      MR. TOM R. PABST   (P27872)
                             MR. JARRETT M. PABST  (73698)
23                           Tom R. Pabst P.C.
                             2503 South Linden Road
24                           Flint, Michigan  48532-5462
                             (810) 732-6792
25                           tom@tomrpabstpc.com
```

```
 1   APPEARANCES (Continued):

 2

 3   For the Defendants:      MS. LINDSAY P. HAZEN   (P85861)
     (GEARUP, Hartley and     Giarmarco, Mullins & Horton, P.C.
 4   Stoody)                  101 West Big Beaver Road
                              Floor 10
 5                            Troy, Michigan  48084-5253
                              (248) 457-7047
 6

 7   For the Defendants:      MS. KAILEN C. PIPER   (P82865)
     (Fenton Schools and      O'Neill, Wallace and Doyle, P.C.
 8   Hartley)                 300 St. Andrews Road
                              Suite 302
 9                            Saginaw, Michigan  48638-5977
                              (989) 790-0960
10                            kpiper@owdpc.com

11
     ALSO PRESENT:            KELLY RODGERS
12

13   REPORTED BY:             Mr. David S. Ripka, CSR 2175
                              Certified Shorthand Reporter
14                            daveripka9@comcast.net
                              (800) 542-4531
15

16

17

18

19

20

21

22

23

24

25
```

Page 3

                    INDEX OF WITNESS

WITNESS                                                    PAGE

NICOLE M. HARTLEY
  Examination by Mr. Pabst                                    4

                    INDEX OF EXHIBITS

EXHIBIT        DESCRIPTION             MARKED

                (NO EXHIBITS MARKED)

Page 4

                        Via Zoom
                 Monday, January 13, 2025
                        11:38 a.m.
                    P R O C E E D I N G S
                    NICOLE M. HARTLEY,
    having been duly sworn by the Court Reporter, was
    examined, and testified on her oath as follows:
                        EXAMINATION
BY MR. TOM PABST:
Q   Yeah, good morning. I'm Tom Pabst, and this is Jarrett
    Pabst, my son and co-counsel. We represent Kelly
    Rodgers, who's sitting at the table with us too.
    And you are Nicole Hartley, correct?
A   Yes.
Q   How do you want me to address you? Nicole? Or is that
    okay, or no?
A   Yeah. Yeah. Nicole is fine.
Q   You can call me Tom too.
A   Okay.
Q   Listen, did you -- you're well familiar with GearUp
    Academy, correct?
A   Yes.
Q   Okay. And GearUp2Grow, is that different than GearUp
    Academy?
A   Yes.

Page 5

Q   Okay. How is it different? Can you just in a couple
    sentences explain the difference.
A   Sure. GearUp2Grow was the program that I started for
    elementary students.
Q   Okay. And GearUp Academy was for like 9 through 12?
A   Yes, I believe so.
Q   When you say "elementary," what grades did that
    encompass?
A   When I initially started, 3rd through 5th.
Q   Okay. And did it change?
A   Yes.
Q   To what?
A   Third threw eighth graders.
Q   Okay. So then it went all the way up to 8th grade, hunh?
A   Yes.
Q   All right. Can you give me some time periods when it was
    like 3 to 5 and then 3 to 8.
A   Sure. So, in 2020, through, I believe, 2022, it was 3rd
    through 5th grade. And then GearUp had a middle school
    program, and Richard Thompson was in charge of that. And
    he was leaving GearUp.
Q   Okay.
A   And so those students needed a place to go. So I ended
    up taking on some of those students --
Q   Okay.

Page 6

A   -- who were in through 8th grade.
Q   How long did you teach GearUp -- at GearUp2Grow? How
    many years did you teach the middle school? I call it
    the middle school. Do you call it that too?
A   No. No.
Q   Okay.
A   My program was just GearUp2Grow.
Q   Okay, GearUp2Grow. How long did you teach at
    GearUp2Grow?
A   I started in 2020 and left in 2022, I believe.
Q   Okay. When you left in 2022, where did you go?
A   In my current position for iWellness Center.
Q   What is that, iWellness Center?
A   It's a company. It's data collection for schools on
    mental health.
Q   Okay. I mean, do you own that, or do you work for them?
A   Both.
Q   Okay. Where's that located?
A   The office is in Michigan, but we're all over the
    country.
Q   Okay. Where are you right now? You're in Florida?
A   Yes.
Q   Okay. That's where you live right now, correct?
A   Yes.
Q   Okay. You know, you know Winston Stoody, correct?

Kelly Rodgers v. Fenton - Nicole M. Hartley  Case 2:23-cv-13110-GAD-CI   ECF No. 39-12, PageID.836   Filed 03/24/25   Page 5 of 9

4 (7 - 10)

Page 7

1  A   Yes.
2  Q   How did you get along with him?
3  A   Fine.
4  Q   How about Kelly Rodgers?  You know Kelly Rodgers, right?
5  A   Yes.
6  Q   How did you get along with Kelly?
7  A   I thought good.
8  Q   Okay.  Did you think that Kelly Rodgers was a truthful
9      and honest person?
10 A   Yes.
11 Q   Okay.  Now, do you know anything about GearUp Academy
12     asking parents to waive IEP rights for their child?
13 A   No.
14         MS. PIPER:  Objection --
15 Q   (BY MR. TOM PABST)  Do you know anything -- Okay.  You
16     just don't know anything about that one way or another,
17     right?
18 A   Right.
19 Q   Okay.  Well, do you know if that was a pattern and
20     practice at GearUp Academy to ask parents to waive their
21     children's IEP rights?
22         MS. PIPER:  Object to form, foundation, asked
23     and answered.
24         Go ahead.
25         MS. HAZEN:  Join.  Thank you.

Page 8

1  Q   (BY MR. TOM PABST)  Go ahead.  They object, and that's
2      okay.  They're just making their objection, and it's
3      preserved on the record.  Judge can rule on it later.
4      But unless they instruct you not to answer, you have to
5      answer, okay, Nicole?
6  A   Sure.
7  Q   So it requires concentration on your part, really,
8      because there's a lot of talking and you're expected to
9      answer the question, you know.
10         So, let me repeat the question.  Do you know if
11     there was a pattern or practice at GearUp Academy to have
12     parents waive the IEP rights for their children?
13         MS. PIPER:  Same objections.
14         Go ahead.  You can answer.
15         MS. HAZEN:  Join.
16         THE WITNESS:  No.
17 Q   (BY MR. TOM PABST)  One way or another, you just don't
18     know, correct?
19 A   Not to my knowledge that was happening.
20 Q   Okay.  Did there ever come a time when you and Adam had a
21     falling out with Winston Stoody?
22 A   Um, I mean, I don't -- I don't think it was a falling
23     out.  We just had a difference of opinion.
24 Q   A difference in philosophies on how to run the school?
25 A   Yes.

Page 9

1  Q   Okay.  Can you just tell us, Nicole, in a couple
2      sentences, what was the differences in philosophies?
3  A   I feel like students need hands-on experiences, life
4      skills.  And I feel like students, in order to be
5      successful in the classroom, should have as many life
6      experiences as possible, and not just be students behind
7      a computer screen.  And so that was my stance.
8          And in, um, I think it was 2021-2022, Winston
9      decided to no longer offer my program through GearUp, so
10     that was kind of the -- the way it split.
11 Q   Winston decided that; that he wasn't going to offer the
12     GearUp2Grow?
13 A   That's my understanding, yes.
14 Q   Do you have any idea why he took that position?
15         MS. PIPER:  I'm going to object to form,
16     foundation.
17         Go ahead.
18         MS. HAZEN:  Join.
19         THE WITNESS:  No.
20 Q   (BY MR. TOM PABST)  Did you ever ask him, say, "What are
21     you thinking?  You know, you -- I -- I got this middle --
22     this GearUp2Grow, and you're saying no more of it"?  Did
23     you ever ask him?
24 A   Yes.
25 Q   And what did he say?

Page 10

1  A   He said he -- his hands were tied and that it was a
2      choice made by Fenton.
3  Q   Okay.  Any idea what he was referring to there?
4  A   No.
5  Q   Well, did you ever have a discussion with your husband
6      Adam about that, what Mr. Stoody said?
7  A   Not that I recall.
8  Q   Okay.  And, apparently, that's what happened, right?  I
9      mean, GearUp2Grow just ended in 2022?
10 A   I don't recall the exact time frame, but yes.  It -- it
11     ended right around there.
12 Q   Okay.  Did you ever express to anyone, Nicole, that you
13     didn't feel comfortable, you know, teaching in the
14     GearUp2Grow program the way it was being run?  Did you
15     ever express that to anyone?
16 A   No.
17 Q   Okay.  So did you feel comfortable, you know, teaching in
18     the GearUp2Grow for the time you were there?
19 A   Yes.
20 Q   Okay.  Did you feel you were certified and qualified to
21     do that?
22 A   Yes.
23 Q   Okay.  You know, did you ever have a handbook?  Did
24     Winston Stoody ever give you a copy of a handbook that
25     you were to look at and follow and use as a guide?

Page 11

1  A   Not that I recall. I don't recall.
2  Q   Are you aware of any handbook that was ever disseminated
3      to any of the staff or pupils at GearUp Academy? Did you
4      ever see one?
5  A   I don't recall, no.
6  Q   Do you know what the Pupil Accounting Manual is?
7  A   I've heard of it.
8  Q   Okay. And what's your understanding of it?
9  A   I mean, my understanding is that it's the processes and
10     procedures of how a public school counts kids.
11 Q   Okay. Do you know who issues that?
12 A   I can make a guess that it's the State of Michigan.
13 Q   Okay. Right.
14         Did anyone from either Fenton Area Schools or
15     GearUp Academy ever sit down with you and say, "Listen,
16     here's the Pupil Accounting manual, and here's two-way
17     communications that we're supposed to do and such"? Did
18     anyone ever explain to you what you should be doing at
19     GearUp2Grow?
20         MS. PIPER: I'm going to object to form,
21     foundation.
22         Go ahead.
23         MS. HAZEN: I'll join. Thank you.
24         THE WITNESS: Can you repeat the question.
25 Q   (BY MR. TOM PABST) Yeah. Maybe I can do a better job

Page 12

1      asking the question.
2          Did anyone ever engage in any training of you
3      as to the Pupil Accounting Manual and what you should do
4      and shouldn't do in accordance with that Pupil Accounting
5      Manual? Did anyone from Fenton ever give you training or
6      anyone from GearUp Academy ever give you any training?
7          MS. PIPER: Same objections.
8          Go ahead.
9          MS. HAZEN: Join.
10         THE WITNESS: No, no training.
11 Q   (BY MR. TOM PABST) Okay. Did anyone ever provide you
12     with a copy of that Pupil Accounting Manual and say,
13     "Hey, you should read this and become familiar, you know,
14     with the rules in here?" Did anyone ever do that?
15 A   No.
16 Q   Did you yourself ever take it upon yourself to read the
17     Pupil Accounting Manual?
18 A   No.
19 Q   Did you yourself ever fill out any two-way communication
20     forms where you had communication with the students
21     and -- and ask them questions, and then kept a log of
22     that two-way communication with the pupil? Did you ever
23     do that?
24 A   Yes.
25 Q   Okay. And how often did you do that?

Page 13

1  A   Gosh, I don't recall. Whenever Fenton would reach out
2      and that it was time for us to do that, I think it was
3      usually a month, maybe, or a couple months.
4  Q   It's not something you did every day, though, hunh?
5  A   No. Took attendance every day, but two-way
6      communications was something different.
7  Q   Who keeps those attendance records? Who -- If we wanted
8      to look at the attendance records, who would we go to?
9  A   I believe Fenton.
10 Q   Okay. Who at Fenton? Any idea of the person?
11 A   I don't. My contacts were Amanda Mogford and Linda
12     Vollick I believe was her last name.
13 Q   Did you turn over the attendance records to those two
14     ladies?
15 A   I didn't have to turn anything over. It's an online
16     system that everybody had access to.
17 Q   Okay. But, I mean, were those your two contact people at
18     Fenton Area Schools that you would have communicated
19     the records to?
20 A   The records are in an online system called Synergy where
21     all of the teachers, all of the school, you know, admin
22     that oversee that part of it, they all have access. We
23     have our own access to that. So everybody sees the same
24     things.
25 Q   Okay. Do you have any of idea how GearUp Academy got

Page 14

1      paid for pupils and the split between Fenton Area Schools
2      and GearUp Academy?
3  A   No.
4  Q   Okay. I'm looking -- Tell me, if you would, please, in
5      just a paragraph or so or explanation, what did you do
6      for these pupils in GearUp2Grow? I mean, did they attend
7      classroom every day like regular kids do from 9:00 to
8      5:00, or was it something different?
9  A   So it just depended. Each kid had an individualized
10     learning plan, but the average schedule was Tuesday,
11     Wednesdays and Thursdays would be in class for at least
12     eight hours with me. We'd either be out in the community
13     on community engagement trips or doing some sort of
14     learning out in the community or in the classroom. Like
15     I said, it was basically all hands-on type things.
16         And then Mondays and Fridays we did, you know,
17     meet online, do some foundational building through online
18     activities that way. But that was -- I mean, it was
19     fluid, but that was pretty much the schedule.
20 Q   Okay. So, Monday, Wednesday and Friday you're saying the
21     kids were in class from what hour to what hour?
22 A   I said Tuesday, Wednesday, Thursday kids were in class --
23 Q   All right. Tuesday, Wednesday, Thursday.
24 A   -- from -- you know, it just depended. These are
25     alternative ed kids. So most would arrive in between

Page 15

1  8:00 and 9:30, and then most would leave at about 2:30,
2  3:00. Just depended on the circumstance of the families.
3  Q  Okay. And you kept logs of their attendance, correct?
4  A  I don't recall keeping a log.
5  Q  Okay. Would there be a reason why you didn't keep a log?
6  A  Because attendance was usually taken in Synergy like I
7     just spoke about, the online system.
8  Q  How about -- You say Tuesday, Wednesday and Thursday.
9     What about Monday and Friday? What type of instruction
10    did you give the kids on Monday and Friday?
11 A  That was usually, you know, foundational, more rote
12    learning things, like, you know, doing math problems
13    together, coming up with math problems, writing
14    activities. It just depended.
15       Each kid was in their own space of learning and
16    their strengths and weaknesses. So whatever needed to be
17    filled on those Mondays and Fridays is what we would do.
18 Q  Okay. So I want to make sure that I understand what
19    you're saying, okay, Nicole? Tuesday, Wednesday and
20    Thursday, the kids would come in from the hours that you
21    said. Where would they come? What building would they
22    go to?
23 A  We were located at the Sylvester Broome Empowerment
24    Village.
25 Q  Okay. So the kids would come to Sylvester Broome for the

Page 16

1  hours that you said, correct, Tuesday, Wednesday and
2  Thursday?
3  A  Correct.
4  Q  But Monday and Friday, where would the kids be?
5  A  They'd either be at home or wherever they -- they lived,
6     and we would meet online, or it just depended on the
7     week. We would be at Ligon Outdoor Learning Center, the
8     public library. It just depended on what we were doing
9     that week and what community engagement trips we had
10    planned.
11 Q  Okay. So you wouldn't necessarily -- you wouldn't see
12    them in person then on Monday or Friday, right?
13 A  No, just --
14    MS. PIPER: Object to form.
15    Go ahead.
16    THE WITNESS: Yeah, go ahead. I'm sorry.
17    MS. PIPER: I just said I object to the form.
18    And then go ahead.
19 Q  (BY MR. TOM PABST) Yeah, go ahead and --
20 A  It just depended. I mean, if -- if -- some weeks we were
21    online on Mondays and Fridays. Some weeks we were, you
22    know, either at -- we had a relationship with a farm
23    where the students would go out and work on the farm. We
24    had a relationship with financial institutions. We had a
25    relationship with Ligon Outdoor Learning Center of

Page 17

1  taking -- you know, it just depended on what we were
2  doing that week, what type of learning objectives they
3  had. And then I tried to tie in an experience with that.
4       So I can't give you a set place we were at. We
5  were just all over the community. And, you know, most of
6  the time it was online Mondays and Fridays. But they
7  would be out in the community on the days that we were
8  not.
9  Q  Okay. And are you saying you were certified to teach
10    6th, 7th and 8th graders on Mondays and Fridays in that
11    type of setting that you just described?
12 A  Yes.
13 Q  Okay. Well, maybe you can help me understand then. I'm
14    looking at Michigan Online Educator Certification System.
15    It's got, "Nicole Marie Hartley."
16       That's your middle name, Marie, right?
17 A  Mm-hmm. Yes.
18 Q  Okay. And it's got your certificate number and type, and
19    then it's got "Subject Grade Level." It's got,
20    "Elementary: K-5, all subjects," but then it's got
21    parentheses, "K-8 all subjects in self-contained
22    classroom," okay? I mean, that's what it reads.
23 A  (Nodding head affirmatively)
24 Q  Do you understand what's being referred to there?
25 A  Yes. I am certified K-8 for self-contained classroom.

Page 18

1  Q  Right. Is Monday and Friday a self-contained
2     classroom --
3  A  Yes.
4  Q  -- the Mondays and Fridays you described?
5  A  Yes.
6  Q  Why is that a self-contained classroom?
7  A  Because it's one cohort of students.
8  Q  Okay. It says here -- there's a definition, "Michigan
9     Department of Education Self-Contained Classroom Guide."
10    And it's got, "A self-contained classroom is a classroom
11    in which one teacher provides instruction to the same
12    pupils for the majority of the instructional day."
13       Are you saying you did that?
14 A  Yes.
15 Q  On Mondays and Fridays you did that?
16 A  Yes.
17 Q  Okay. Did you ever tell anyone that you weren't
18    certified to teach in the GearUp2Grow program and you
19    wanted someone else to take it over?
20 A  Not that I recall, no.
21 Q  Well, that's not something you'd forget, right? I mean,
22    you would know if you said that?
23 A  I'm sure I would.
24 Q  Okay. And you say you didn't say that?
25 A  Correct.

Page 19

1  Q  Okay. Was there ever any discussion about either Winston
2     Stoody or Kelly Rodgers taking over the GearUp2Grow
3     program?
4  A  No.
5  Q  Do you know if Winston Stoody had the qualifications to
6     take over the GearUp2Grow program?
7  A  I have no idea.
8  Q  Okay. How about Kelly Rodgers? Do you know what her
9     qualifications would have been?
10 A  I know she's not a certified teacher.
11 Q  Okay.
12        MR. TOM PABST: Give me just a minute, okay,
13     Nicole?
14        THE WITNESS: Mm-hmm.
15          (Discussion off the record. Recess taken
16           at 11:57 a.m. Deposition resumed at or
17           about 11:59 a.m.)
18        MR. TOM PABST: Okay. Ready. Just a few more
19     questions, Nicole.
20 Q  (BY MR. TOM PABST) You know, did you ever have a
21     discussion with Winston Stoody about you wanting to run
22     the GearUp2Grow or the GearUp Academy, whichever, from
23     Florida where he said, "You can't do it from Florida"?
24     Did any conversation like that ever happen between you
25     and Winston Stoody?

Page 20

1  A  No.
2  Q  How about between Adam Hartley, your husband, and Winston
3     Stoody?
4        MS. PIPER: I'm going to object to form,
5     foundation, calls for speculation.
6        But go ahead and answer if you know.
7        MS. HAZEN: Join. Thank you.
8        MR. TOM PABST: Well, let me -- let me rephrase
9     the question.
10 Q  (BY MR. TOM PABST) Did Adam Hartley ever tell you he had
11     a conversation with Winston Stoody where Stoody said,
12     "You can't run this program from Florida long distance"?
13 A  No.
14 Q  Did you ever plan on running the program from Florida
15     long distance?
16 A  I wouldn't be running it, but we had conversations about
17     what it would look like.
18 Q  Tell me about that. What would it look like? If you're
19     in Florida and you're running the program up here in
20     Michigan, how -- what do you mean? What would it look
21     like?
22 A  So we had multiple aides at that time that could be in a
23     physical space with the kids and I could be online with
24     the kids. That was something that was thrown around and
25     talked about between me and Kelly Bell. Kelly Bell was

Page 21

1     my aide and assistant.
2  Q  Do you think it would have been feasible for you and Adam
3     to be in Florida and run the program here in Michigan?
4        MS. PIPER: I'm going to object to form,
5     foundation, calls for speculation and relevance.
6        Go ahead.
7        MS. HAZEN: I'll join. Thank you.
8        THE WITNESS: Can you repeat the question.
9  Q  (BY MR. TOM PABST) Yeah. Do you think it would have
10     been feasible, doable, you know, that you and Adam were
11     in Florida but yet could run the program here in
12     Michigan?
13        MS. PIPER: Same objections.
14        Go ahead and answer if you can.
15        MS. HAZEN: Join.
16        THE WITNESS: I -- I don't know how to answer
17     that. I -- Adam wouldn't have ran my program.
18 Q  (BY MR. TOM PABST) Okay. Did Adam want to run the
19     GearUp Academy program from Florida?
20 A  Not that I recall.
21 Q  Okay. Do you know if Adam ever made a recommendation to
22     the board at GearUp Academy to terminate Winston Stoody's
23     employment?
24 A  Not that I recall.
25 Q  Not that you recall.

Page 22

1        MR. TOM PABST: What is it, Second Learning --
2        MR. JARRETT PABST: Second Street Learning.
3  Q  (BY MR. TOM PABST) Second Street Learning; is that
4     right? Do you own that?
5  A  It's a nonprofit, so nobody really owns it.
6  Q  Is that a 501(c)(3)?
7  A  Yes.
8  Q  And what services does it provide, you know, and maybe
9     you could give us a comparison between GearUp2Grow and --
10     and Second Street Learning. How are they different?
11 A  Well, they're pretty much the same. The philosophy's the
12     same. The way it's ran is the same. However, I just --
13     I don't have a day-to-day part in that. That's not -- I
14     just kind of sit on the board and, you know, make
15     recommendations and just give my expertise. But I'm not
16     involved in the day-to-day of that.
17 Q  Who does run it day-to-day?
18 A  Todd Hartley.
19 Q  Todd. And who is that?
20 A  He is my brother-in-law.
21 Q  Okay. Is he the executive officer; do you know?
22 A  His title is -- I think he's the executive director of
23     learning and operations, I think, is his title.
24 Q  Okay. Do you know who P███ O████ is?
25 A  Yes.

Page 23

```
 1  Q    Who is P███ C████?
 2  A    He was a student at GearUp.
 3  Q    Okay.  Do you know anything about his educational
 4       history?
 5  A    Not a whole lot, no.
 6  Q    Well, what do you know?
 7  A    I know he was a student at GearUp.  I don't know how many
 8       years.  He worked with me in my program I believe for a
 9       little bit, but that was just to build up his social
10       skills and give him some confidence.  He struggled in
11       that area.  He just needed some love and support.  So he
12       would join in with us on our field trips and community
13       engagement trips and that kind of thing.
14  Q    Okay.  Do you have any you idea why Winston Stoody would
15       have given P███ C████ family a Cadillac automobile?
16            MS. PIPER:  I'm going to object to form,
17       foundation.
18            Go ahead.
19            MS. HAZEN:  Join.
20            THE WITNESS:  No, other than they're a needy
21       family and, um, can use a lot of support.
22  Q    (BY MR. TOM PABST)  Do you know a pupil named T████
23       B████████?
24  A    No.
25  Q    Okay.  Do you know anything about a contract between
```

Page 24

```
 1       GearUp Academy and Genesee Circuit Court?
 2  A    No.
 3  Q    Okay.  You probably don't know anything about a sliding
 4       scale that was created to divide money between Fenton
 5       Area Schools and GearUp Academy?  You don't know anything
 6       about that, do you?
 7  A    No.
 8            MR. TOM PABST:  Okay.  That's all I have.
 9       Thanks.
10            I'll pass the witness.
11            MS. HAZEN:  I don't have any questions.
12            MS. PIPER:  You're all set with me as well.
13       Thank you, Nicole.
14            THE WITNESS:  Thank you.
15            MR. TOM PABST:  Thank you, Nicole.
16            (Deposition concluded at 12:05 p.m.)
```

Page 25

```
 1  CERTIFICATE OF NOTARY PUBLIC
 2  DEPONENT:  NICOLE M. HARTLEY        (STATE OF MICHIGAN)
    RECORDED:  January 13, 2025         (      SS      )
 3  LOCATION:  Via Zoom                 (COUNTY OF GENESEE)
```

Being a Notary Public duly commissioned and qualified in and for the State of Michigan at Large, I do hereby certify that pursuant to notice there came before me the deponent herein, who was by me first duly sworn to testify to the truth and nothing but the truth touching and concerning the matters in controversy in this cause.

Being thereupon carefully examined under oath, said examination was recorded stenographically and was later reduced to transcription under my supervision; said transcription being a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto subscribed my signature this 23rd day of January, 2025.

David S. Ripka, CSR-2175

MY COMMISSION EXPIRES:
December 29, 2028