UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY RODGERS,

   Plaintiff,

              Case No.: 2:23-cv-13110

v.             Hon. Gershwin A. Drain


FENTON AREA PUBLIC
SCHOOLS, GEARUP2LEAD,
ADAM HARTLEY, and
WINSTON STOODY,

   Defendants.

_____/

## OPINION AND ORDER GRANTING GEARUP2LEAD, ADAM HARTLEY, AND WINSTON STOODY'S MOTION FOR SUMMARY JUDGMENT [ECF No. 38] AND GRANTING FENTON AREA PUBLIC SCHOOLS AND ADAM HARTLEY'S MOTION FOR SUMMARY JUDGMENT [ECF No. 39]

Presently before the Court is GearUp2Lead ("GU2L"), Adam Hartley (in his role as an employee of GU2L), and Winston Stoody's Motion for Summary Judgment, and Adam Hartley (in his role as Superintendent of Fenton Area Public Schools) and Fenton Area Public Schools' Motion for Summary Judgment. The Court concludes that a hearing will not aid in the disposition of these motions and will determine the outcome on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the

reasons that follow, both Motions for Summary Judgment [ECF No. 38; ECF No. 39] are GRANTED.

## I.   BACKGROUND

Defendant GU2L is a non-profit organization based in Flint, Michigan, which Defendant Adam Hartley founded in 2014. ECF No. 38-3, PageID.278. GU2L runs an alternative high school education program called "GearUp Academy" that helps marginalized and disadvantaged students to finish high school, connects them with resources and opportunities to be successful, and fosters their social-emotional growth. ECF No. 38-4, PageID.298; ECF No. 38-6, PageID.425; ECF No. 38-7, PageID.510. Hartley was the executive director of the organization until he was hired by Fenton Area Public Schools as the Superintendent in 2016. ECF No. 38-6, PageID.423. Defendant Winston Stoody became the executive director after that. ECF No. 38-7, PageID.509. Hartley remained on the board of directors and was affiliated with the organization until late spring of 2023. *Id.* at PageID.509–10; ECF No. 38-6, PageID.421–22.

Plaintiff Kelly Rodgers began volunteering full-time for GU2L in 2016, around the time that Stoody became executive director. ECF No. 38-4, PageID.290. Plaintiff played a role in recruiting students, spreading the message about GU2L, and raising money for the organization. ECF No. 38-4, PageID.295. When GU2L eventually got funding in December 2017, it hired Plaintiff in a paid capacity. *Id.* at

2

PageID.297. Plaintiff's primary role was directing the high school-level "GearUp Academy" program; she described her role as "a coach or mentor, just support." *Id.* at PageID.299, 381. Stoody explained that Plaintiff's duties included communicating with families and students, enrollment, outreach, mentoring, and providing resources. ECF No. 39-7, PageID.786. Plaintiff was not a certified teacher and did not teach the students. ECF No. 38-4, PageID.298.

In September 2018, GU2L and Fenton Area Public Schools entered into an agreement by which GU2L would provide outside support to Fenton's alternative education students. ECF No. 38-6, PageID.429; ECF No. 38-7, PageID.498. GU2L and Fenton split the state funding for each pupil. ECF No. 39-7, PageID.784. Fenton was responsible for providing the teaching, curriculum, and teachers, while GU2L provided a support system for students' success, through resources, networking opportunities, and life skills. ECF No. 38-4, PageID.370–71. Plaintiff and the Fenton liaison, Jim Golen, collaborated to ensure "the students were on track with their courses" and that they were receiving accommodations they needed. ECF No. 38-8, PageID.541–42.

In 2019, GU2L began expanding. GU2L hired Richard Kerry Thompson (known as "RKT"), who developed a program designed for middle schoolers. Like the GearUp Academy program, middle schoolers in GU2L's middle school program would receive their substantive education from Fenton teachers. ECF No. 38-8,

PageID.556; ECF No. 39-2, PageID.734. Plaintiff disagreed with GU2L developing the middle school program. She believed that GU2L did not have the means to support these students and felt that RKT was not certified to teach them. ECF No. 39-2, PageID.718–19. Plaintiff claims that multiple individuals told her that RKT was not "certified." *Id.* RKT was not a certified teacher, but he did have a school administrator certificate. ECF No. 38-9, PageID.568.

In 2020, GU2L hired Nicole Hartley, Adam Hartley's wife, who developed a program designed for elementary students called "GearUp2Grow." ECF No. 38-10, PageID.573. This was a hands-on, project-based learning program. ECF No. 38-4, PageID.304. RKT left GU2L around 2022, at which point Nicole also assumed direction of the middle school program. ECF No. 38-10, PageID.573–74. Plaintiff objected to Nicole teaching these programs because she believed Nicole was not "certified." Plaintiff claims that multiple people, including Nicole herself, told her that Nicole was not certified. ECF No. 39-2, PageID.720. However, Nicole was certified to teach early childhood education, K-5 in all subjects, and K-8 in all subjects in a self-contained classroom. ECF No. 38-11.

Plaintiff began to have disagreements with GU2L's leadership. Plaintiff claims that in April 2022, she met with Hartley and Stoody. According to Plaintiff, Hartley told her that she would take over the middle school program because Nicole "is not comfortable and not certified to continue with the middle school." ECF No.

4

39-2, PageID.720. Plaintiff "did not agree" with taking over the middle school program because she was not "certified or prepared." *Id.* In addition, Plaintiff claims that Hartley told her to accept middle school students into the ninth grade, which she disagreed with because she felt that would set those students up for failure. *Id.* at PageID.721. Plaintiff admits, however, that this topic was never discussed again, and that she believed she would still be forced to take over the middle school program simply because "nothing was said otherwise." *Id.* at PageID.721–22. Ultimately, GearUp Academy took no steps to take over the middle school, and Nicole continued to run the middle school program even after Plaintiff eventually resigned from GU2L. *Id.*

Plaintiff also took issue with what she claims was GU2L's practice of asking parents to revoke their children's individual education plans ("IEPs") in order to enroll them in a GU2L program, because GU2L could not accommodate special needs. *Id.* at PageID.722. However, under the contract between Fenton and GU2L, Fenton was supposed to provide the support necessary for the students receiving special education under an IEP. ECF No. 39-4. Moreover, Plaintiff admitted that GU2L did have students who had IEPs and did provide certain accommodations. ECF No. 39-2, PageID.725; *see also* ECF No. 39-14. Stoody testified that it is not possible to *require* anyone to drop an IEP, ECF No. 39-7, PageID.788, and Hartley

explained that parents do have a right to revoke an IEP if they want to. ECF No. 39-3, PageID.747; *see also* 34 C.F.R. § 300.9(c).

During her time at GU2L, Plaintiff was never disciplined or demoted, and in fact received a $5,000 raise (from $48,000 to $53,000) in 2019 and a $7,000 raise (from $53,000 to $60,000) in 2020. ECF No. 39-2, PageID.717. Around July 2022, Plaintiff proposed to GU2L that she receive $10,000 in health insurance benefits and another $5,000 raise because she felt that she was "undervalued and underappreciated, and [she] just wanted what was fair." ECF No. 39-2, PageID.718. Plaintiff alleges that this request was approved because she and Stoody "fist bumped" to those terms, *id.* at PageID.717, and because Plaintiff has a text message between herself and Stoody, in which she informed Stoody about how she planned to word her request to Hartley, and Stoody said "looks good to me." ECF No. 38-12, PageID.597. However, Stoody could not unilaterally approve pay raises or benefits, as those were actions that had to be approved through the GU2L board. ECF No. 38-7, PageID.510. All of Plaintiff's pay raises were approved through the board. ECF No. 38-13, PageID.603.

Ultimately, Plaintiff was not given the $5,000 raise, but the board approved her for $10,000 in health insurance benefits. ECF No. 39-2, PageID.718. Stoody began the process of obtaining health benefits for Plaintiff and her coverage was set

to begin in October 2022.[1] *Id.*; ECF No. 38-15. However, Plaintiff made the decision to resign from GU2L in September 2022. ECF No. 39-2, PageID.722. Plaintiff testified that she felt that she was forced to resign because she was being "forced to take the students in the middle school" that she did not want to take, because she did not want to accept middle schoolers into the ninth grade, and because she "disagreed that these students were getting the proper education and services that they deserved." *Id.* at PageID.729–30. Plaintiff also testified that she would have stayed if she received the $5,000 raise and health benefits, if they gave her a job description, and if GU2L would have held meetings where employees could "talk about what [they] were doing or not doing." *Id.* at PageID.730.

Plaintiff's last day was on October 3, 2022, and she was paid through October 31, 2022. *Id.* at PageID.721. Plaintiff stated in her deposition that no one at GU2L ever told her that she was fired or that she was otherwise laid off, and that it was her decision to leave. *Id.* at PageID.738. Regardless, Plaintiff filed for unemployment and claimed that she was laid off. ECF No. 39-17, PageID.861. In a text message from Stoody to Plaintiff, Stoody told Plaintiff that by filing for unemployment, she put him and GU2L "in a bad position," noting that she was asking him "to lie," and asking GU2L to pay additional funds into unemployment. *Id.*

---

[1] No other GU2L employee received health benefits. ECF No. 39-2, PageID.738.

Plaintiff filed the instant action on December 7, 2023 against Hartley, Stoody, GU2L, and Fenton Schools. *See* ECF No. 1. In the complaint, Plaintiff claims that she had complained to Hartley and Stoody about fraud occurring at GU2L, that guidelines and rules were not being followed, that students were being set up to fail and used as pawns to generate money for Fenton Schools and GU2L, that taxpayer money was being wasted and misused by GU2L, and that students were not being taught by certified teachers. *Id.* at PageID.4. Plaintiff claims that Defendants then forced her out of her job for making these complaints. *Id.* She brings claims for First Amendment Retaliation (Count I), Race Retaliation and Hostile Work Environment under the Elliot-Larsen Civil Rights Act ("ELCRA") (Count II), and Violation of Article I, § 17 of the Michigan Constitution (Count III).

Defendants Hartley (in his capacity as employee of GU2L), Stoody, and GU2L filed a motion for summary judgment, and Defendants Hartley (in his capacity as Superintendent of Fenton Schools) and Fenton Schools filed a separate motion for summary judgment. *See* ECF No. 38; ECF No. 39. Many of the arguments between these parties are the same and their motions will be addressed simultaneously.

## II.   LAW & ANALYSIS

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" by identifying portions of the record that demonstrate an absence of a material dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When a "properly supported motion for summary judgment is made," the burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must construe all reasonable inferences in favor of the nonmoving party when conducting its analysis. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. First Amendment and ELCRA Retaliation

Plaintiff claims that Defendants retaliated against her for exercising her First Amendment rights and retaliated against her under ELCRA when she voiced her disagreement with: (1) GU2L's middle school program, (2) being asked to accept middle schoolers into the ninth grade, (3) GU2L's alleged failure to hire certified teachers, and (4) GU2L's alleged practice of asking parents to revoke their children's

IEPs.[2] Plaintiff claims that the adverse employment actions against her were: (1) forcing her to take over the middle school when she was not qualified to do so, (2) withholding Plaintiff's $5,000 raise until she capitulated and took over the middle school; and (3) forcing her to accept middle schoolers into the ninth grade when they were not ready (due to not having certified teachers and being coerced to waive their IEPs). Plaintiff similarly argues that these actions essentially forced her to resign, such that she was constructively discharged.

In both motions for summary judgment, Defendants argue that they are entitled to summary judgment on Plaintiff's First Amendment retaliation claim and ELCRA retaliation claim. Defendants present a myriad of arguments on the lack of viability of these claims. The Court will focus on their argument that there was no "adverse action" against Plaintiff sufficient to sustain a First Amendment or ELCRA retaliation claim.

The First Amendment prohibits state actors from retaliating against an individual for their protected speech. To state a *prima facie* case of First Amendment retaliation, a plaintiff must show that (1) she engaged in protected conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness

---

[2] Plaintiff claims that these were racial-discrimination related complaints under ELCRA because 80% of GU2L's student population is Black. ECF No. 40, PageID.876 n.1.

from continuing to engage in that conduct, and (3) there is a causal connection between elements one and two—"that is, the adverse action was motivated at least in part by [her] protected conduct." *Sensabaugh v. Halliburton*, 937 F.3d 621, 627–28 (6th Cir. 2019) (quoting *Bell v. Johnson*, 308 F.3d 594, 602 (6th Cir. 2002)).

Similarly, the ELCRA prohibits individuals from retaliating against a person because she opposed a violation of the act.[3] Mich. Comp. Laws § 37.2701(a). To establish a *prima facie* case of unlawful retaliation under the ELCRA, "a plaintiff must show (1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *El-Khalil v. Oakwood Healthcare, Inc.*, 934 N.W.2d 665, 670–71 (Mich. 2019).[4]

In other words, both a First Amendment retaliation claim and an ELCRA retaliation claim require evidence of an adverse employment action. For both First

---

[3] Under the ELCRA, it is a violation of the act to discriminate on the basis of religion, race, color, national origin, age, sex, sexual orientation, gender identity or expression, height, weight, familial status, or marital status in relation to employment, housing, public accommodations, public service, or educational facilities. Mich. Comp. Laws § 37.2102.

[4] Notably, the "analysis is identical" for retaliation claims under the ELCRA and retaliation claims under Title VII, its federal counterpart. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012). Thus, cases discussing Title VII retaliation claims are frequently used to analyze ELCRA retaliation claims, as the Court does herein.

Amendment and ELCRA claims, the standard for an adverse action is essentially the same. The term "adverse action" means "one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999) (in relation to First Amendment retaliation); *Beny v. Univ. of Mich. Bd. of Regents*, 740 F. Supp. 3d 621, 644–45 (E.D. Mich. 2024) ("For [ELCRA] retaliation to be actionable, a plaintiff 'must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'").

"In the employment context, '[t]he term 'adverse action' has traditionally referred to actions such as discharge, demotions, refusal to hire, nonrenewal of contracts, and failure to promote.'" *Sensabaugh*, 937 F.3d at 628 (quoting *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012)). However, there is no bright-line rule. "[W]hat might constitute an adverse employment action in one employment context might not be actionable in another employment context." *Chen v. Wayne State Univ.*, 771 N.W.2d 820, 839 (Mich. Ct. App. 2009); *see also White v. Dep't of Transp.*, 964 N.W.2d 88, 98 (Mich. Ct. App. 2020). Nevertheless, "it must be more than a mere inconvenience or minor alteration of job responsibilities," and "there must be an objective basis for demonstrating that the employment action

is adverse because a plaintiff's subjective impressions are not controlling." *Chen*, 771 N.W.2d at 839.

In this case, Plaintiff's alleged "adverse actions" have no support in the record and are utterly incredible. Plaintiff claims that she was "being harangued" to take over the middle school, ECF No. 40, PageID.875, but the record reflects that no one even talked to her about this topic after the first time it was allegedly brought up, nothing was ever done in furtherance of taking over the middle school, and Nicole continued to run the middle school as usual. ECF No. 39-2, PageID.721–22.[5] Plaintiff claims that Defendants withheld her $5,000 raise until she "capitulated" to taking over the middle school, ECF No. 40, PageID.875, but there is no evidence whatsoever that the raise was conditional on her taking over the middle school. In fact, there is no evidence that the board ever would have agreed to that raise.[6] Finally,

---

[5] Furthermore, Plaintiff repeatedly claims that she was not "qualified" to take over the middle school and that to do so would be a violation of state law, yet she never identifies what qualifications she was missing or what state law it would violate. It is undisputed that certified Fenton teachers were responsible for teaching substantive courses, and that GU2L was simply an organization that provided outside support to Fenton students. It is completely unclear what certifications are needed to work in this support-related role. Moreover, Plaintiff never complained about running GU2L's high school program, despite lacking any certification herself. It is also completely unclear why running the middle school program required anything more than the high school program.

[6] Plaintiff claims that her raise was approved by Stoody. But Stoody could not unilaterally approve Plaintiff's raise; that was the duty of the GU2L board. Evidently, Plaintiff understood this fact. In the text message between Plaintiff and Stoody about her requested raise, she informed Stoody about the wording she planned to use when bringing the raise request up to *Hartley*, who was a member of

Plaintiff claims that she was forced to accept students into ninth grade who were not ready, ECF No. 40, PageID.875–76, but she testified that she was never forced to do that and she declined students whom she felt were not ready for ninth grade. ECF No. 39-2, PageID.723. In other words, Plaintiff's "subjective impressions" about the conditions of her employment have no "objective basis" and do not constitute adverse actions. *Chen*, 771 N.W.2d at 839.

Plaintiff also mentions that Hartley told her in April 2022 that he could hire someone for $15 an hour to do her job, a comment to which she took offense. ECF No. 40-10, PageID.1036.[7] In addition, Plaintiff mentions that Stoody would get "upset" when Plaintiff would accuse him of letting Hartley "call[] all the shots." ECF No. 40-6, PageID.990. To the extent Plaintiff claims that these negative comments or reactions are adverse employment actions against her, they fall far short of meeting that standard. *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 997 (6th Cir. 2009) (the team leader's "single, isolated remark" to the plaintiff that any high schooler could do the plaintiff's job "does not rise to the level of a materially adverse employment action."); *Minevich v. Spectrum Health-Meier Heart Ctr.*, 1 F. Supp.

---

the GU2L board. ECF No. 38-12. In addition, Plaintiff's past raises were approved by the board, not by Stoody. *See* ECF No. 38-13. Thus, the fact that Stoody was amenable to Plaintiff's raise has no relevance here.

[7] Hartley apologized to Plaintiff for the harsh comment. ECF No. 40-10, PageID.1036.

3d 790, 808 (W.D. Mich. 2014) ("[M]ere yelling or harsh treatment is not an adverse employment action. [ELCRA] is not a general civility code.").

To the extent Plaintiff claims that she was constructively discharged, thereby satisfying the adverse employment action factor, that claim also fails. "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (quotation marks and citation omitted). "In general, however, employee resignations are presumed to be voluntary." *Jones v. St. Clair County*, No. 24-cv-11965, 2025 WL 3754228, at *6 (E.D. Mich. Dec. 29, 2025) (quotation marks and citation omitted). To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit. *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012); *see also Vagts v. Perry Drug Stores, Inc.*, 516 N.W.2d 102, 105 (Mich. Ct. App. 1994).

As already explained, Plaintiff has adduced no evidence to support her contention that she was being forced to do anything she did not want to do in her job. If she felt criticized by Hartley or Stoody, "[s]uch criticisms… do not establish constructive discharge," *Savage*, 665 F.3d at 739, and "hurt feelings are not enough

15

to create a case of constructive discharge." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 479 (6th Cir. 2002). In any event, there is absolutely no evidence that Defendants did anything to Plaintiff with the *intent* to compel her resignation. Indeed, if Plaintiff's version of the story is to be believed (regardless of the lack of evidence), Defendants *wanted* Plaintiff to continue working and to take on more responsibilities.

In all, Plaintiff was not fired, demoted, laid off, or subjected to any other adverse action traditionally associated with employment-related retaliation cases. ECF No. 39-2, PageID.738. There is no evidence that her pay was affected, her prospects for advancement were affected, or that her responsibilities were affected. In fact, Plaintiff was approved to receive health insurance benefits that were not offered to any other GU2L employee.[8] ECF No. 38-15. Thus, by all accounts, Plaintiff's conditions of employment actually *improved* after her alleged "protected activities." *See Nickell v. Memphis Light, Gas & Water Div.*, 76 F. App'x 87, 93 (6th Cir. 2003) (finding no adverse employment action where the plaintiff's conditions of employment actually improved because he "received a merit raise.").

---

[8] Plaintiff claims that Defendants never intended to give Plaintiff health insurance and asks "[w]here is any proof that Defendants ever applied for medical insurance for Plaintiff Rodgers?" ECF No. 40, PageID.901. Defendants presented ample proof that they applied and were in the process of setting up insurance for Plaintiff. *See* ECF No. 39-16. In contrast, Plaintiff has presented no evidence whatsoever that Defendants did not actually intend to give Plaintiff that insurance.

Therefore, Plaintiff has failed to establish that Defendants took any adverse employment action against her. Summary judgment is granted on Plaintiff's First Amendment and ELCRA retaliation claims (Counts I and II).

## C. Hostile Work Environment

Count II of Plaintiff's complaint arguably contains a hostile work environment claim under the ELCRA. Plaintiff claims that she experienced a hostile work environment when Stoody referred to two employees with the same first name by their race: "Black Tiffany" and "White Tiffany." ECF No. 1, PageID.9; ECF No. 40-6, PageID.989–90. Plaintiff claims that when she told Stoody that referring to individuals by their race was inappropriate, he laughed it off. ECF No. 40-6, PageID.990. In Plaintiff's response briefs, Plaintiff also contends that all the "adverse actions" against her for purposes of her retaliation claims also contributed to the hostile work environment. ECF No. 40, PageID.899–900. Defendants argue that Plaintiff has failed to create a question of material fact on the hostile work environment claim.

The prima facie elements of an ELCRA hostile work environment claim are:

(1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an

intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Scotland v. DTE Energy Corp. Servs., LLC*, No. 369512, 2025 WL 3768113, at *7 (Mich. Ct. App. Dec. 30, 2025). "[W]hether a hostile work environment was created by the unwelcome conduct [is] determined by whether a reasonable person, in the totality of the circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Major v. Vill. of Newberry*, 892 N.W.2d 402, 418 (Mich. Ct. App. 2016) (citation omitted).

Plaintiff has not demonstrated that Stoody's references to "Black Tiffany" and "White Tiffany" were so pervasive that they substantially interfered with her employment or created an intimidating, hostile, or offensive employment environment. "The essence of a hostile work environment action is that 'one or more supervisors or co-workers create an atmosphere so infused with hostility toward members of [a protected class] that they alter the conditions of employment for them.'" *Radtke v. Everett*, 501 N.W.2d 155, 163 (Mich. 1993) (citation omitted). The unwelcome conduct must be "sufficiently severe and persistent to affect seriously the psychological well being of the employees in question." *McCallum v. Dep't of Corr.*, 496 N.W.2d 361, 367 (Mich. Ct. App. 1992) (quotation marks and citation omitted). There is no information in the record about how frequently Stoody

made this tasteless comment or the effects it had on Plaintiff's employment. Indeed, this claim is relegated to a single sentence in Plaintiff's complaint and was the subject of a mere four questions in Plaintiff's deposition. ECF No. 40-6, PageID.989–90. There is simply nothing in the record to support the hostile work environment claim on this basis.

Moreover, the Court has already found that there is no evidence in the record supporting the alleged "adverse actions" against Plaintiff, so such allegations also fail when considered in relation to the hostile work environment claim.

Accordingly, summary judgment is granted on Plaintiff's hostile work environment claim under the ELCRA (Count II).

### D. Michigan Constitution Violation

Count III of Plaintiff's complaint raises a claim for a violation of Article 1, § 17 of the Michigan Constitution. Section 17 provides that "[t]he right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed." Mich. Const. art. I, § 17. Plaintiff claims that Defendants violated Plaintiff's right to "fair and just treatment" in investigations under § 17. ECF No. 1, PageID.12. Defendants argue that Plaintiff fails to state a claim under this section, and Plaintiff neglected to respond to this argument.

In *Johnson v. Wayne County*, the Michigan Court of Appeals noted that the "fair and just treatment" language in § 17 "refers to such treatment in the course of legislative and executive investigations and hearings." 540 N.W.2d 66, 71 (Mich. Ct. App. 1995); *see also Jo-Dan, Ltd. v. Detroit Bd. of Educ.*, No. 201406, 2000 WL 33416896, at *7 (Mich. Ct. App. July 14, 2000) ("[T]his right exists only in the context of legislative and executive hearings and investigations… and not before a hearing or investigation commences or after a hearing or investigation ceases."). Plaintiff has not alleged, nor is there any evidence of, a legislative or executive investigation or hearing that relates to this case. Indeed, there is no evidence of any investigation at all.[9]

Accordingly, summary judgment is granted on Plaintiff's Michigan Constitution claim (Count III).

---

[9] Plaintiff seems to assert that Hartley conducted an "investigation" of whether Plaintiff could "take over the Middle School and/or take Middle School kids into the 9th grade." ECF No. 40, PageID.899. Aside from the fact that this "investigation" has no executive or legislative character, it is not even an "investigation" for § 17 purposes. *See Carmacks Collision, Inc. v. City of Detroit*, 684 N.W.2d 910, 913 (Mich. Ct. App. 2004) (noting that an 'investigation' under this section requires a "searching inquiry for ascertaining facts" or a "detailed or careful examination" of the events or facts in question). There is no evidence, or even allegation, that Hartley did anything more than simply tell Plaintiff that she would be "taking over" the middle school.

### III.    CONCLUSION

For the foregoing reasons, the Motions for Summary Judgment [ECF No. 38; ECF No. 39] are **GRANTED**.

**IT IS SO ORDERED.**

Dated:  March 13, 2026                    /s/Gershwin A. Drain
                                          GERSHWIN A. DRAIN
                                          United States District Judge